CITY OF NEW HAVEN,
CONNECTICUT,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

NATIONAL LEAGUE OF CITIES,
et al., Plaintiffs,

v.

Samuel R. PIERCE, Jr., et
al., Defendants.

The CITY OF CHICAGO, et
al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOP-
MENT, et al., Defendants.

Civ. A. Nos. 86–0967, 86–0460
and 86–0455.

United States District Court,
District of Columbia.

May 16, 1986.

Neil T. Proto, Kelley Drye & Warren, Washington, D.C., for plaintiff City of New Haven.

David Vladeck, Washington, D.C., for plaintiff National League of Cities.

Judson H. Miner, Joel D. Stein, Chicago, Ill., for plaintiff City of Chicago.

Dennis G. Linder, Jeffrey S. Paulsen, Robert Chestnut, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

These consolidated cases, now before the Court on the parties' cross-motions for summary judgment, present a challenge to the President's deferral of the expenditure of funds appropriated by Congress for various domestic programs in fiscal 1986.[1] Specifically, plaintiffs contend that the statute pursuant to which the President has acted to defer "budget authority"[2] is unconstitutional by reason of the presence of an inseverable one-House legislative veto provision in the legislation as enacted. For the reasons set forth below, plaintiffs' motions for summary judgment will be granted, defendants' motion for summary judgment denied, and the declaratory and injunctive relief sought will be entered as prayed.

### I.

In November, 1985, President Reagan signed the fiscal year 1986 appropriations bill for the Department of Housing and Urban Development ("HUD"), Pub.L. No. 99–160, 99 Stat. 909 (1985), which appropriated funds for certain long-standing local housing and community development programs. On February 5, 1986, the President sent impoundment notices to Congress pursuant to the Budget and Impoundment Control Act of 1974 announcing his deferrals of the expenditure of funds for the four programs at issue here. H.Doc. No. 99–161, 99th Cong., 1st Sess. 246–53 (1986); 51 Fed.Reg. 5829, 5953–58 (Feb. 18, 1986). The deferrals were not made in response to the Balanced Budget and Emergency Defi-

cit Control Act of 1985, Pub.L. No. 99–177, 99 Stat. 1038, (1985), but were, rather, intended by the President to bring 1986 spending levels into line with his 1987 proposed budget. H.Doc. No. 99–161 at 246. The deferrals have been put into effect and are indisputably having a present (and by plaintiffs undesired) impact on the programs, their proponents, and their intended beneficiaries.

Plaintiffs are various representatives of those affected: cities, mayors, community groups, members of Congress, associations of mayors and municipalities, and disappointed expectant recipients of benefits under the programs so diminished. Nominal defendants are the United States, the Secretary of HUD (the "Secretary"), and the Director of the Office of Management and Budget ("OMB").

Of the four programs in jeopardy the first is known as the Section 8 Housing Assistance Payments Program ("Section 8"), established by the Housing and Community Development Act of 1974, amending the Housing Act of 1937. 42 U.S.C. § 1437f (1982 & Supp. I 1983 & Supp. II 1984). Section 8's purpose is to assist lower-income families in obtaining housing by, *inter alia*, a direct housing subsidy. The Secretary of HUD disburses funds to state and local housing agencies which, in turn, use the funds to obtain housing for low income families. The HUD appropriations bill for fiscal year 1986 included nearly $2.4 billion for direct housing subsidies, of which the President has deferred all but $184 million.

The second program concerned was created by Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q (1982 & Supp. I 1983 & Supp. II 1984) ("Section 202"), to

---

1. Jurisdiction is predicated upon 28 U.S.C. § 1331.

 Plaintiffs initially sought a preliminary injunction, and the parties submitted memoranda accordingly. Prior to hearing, however, the parties proposed, and the Court agreed, that the matter be treated as one of cross-motions for summary judgment, the issues being exclusively of law and the merits having been fully briefed. The Court consolidated the hearing on plaintiffs' motion for a preliminary injunction with hear-

ing on the merits pursuant to Fed.R.Civ.P. 65(a)(2), gave the parties additional time to supplement the record as appropriate to cross-motions for summary judgment, and has decided the case on an expedited basis.

2. "Budget authority" means the "authority provided by law to enter into obligations which will result in immediate or future outlays involving Government funds...." 2 U.S.C. § 622(2) (1982).

assist in housing the elderly and handicapped with direct loans to private non-profit corporations, limited profit sponsors, consumer cooperatives, and certain public agencies for use in constructing or rehabilitating low cost rental units. Section 202 also operates in conjunction with Section 8 to provide a direct subsidy for rental costs incurred by elderly and handicapped people living in Section 202 housing. The fiscal year 1986 HUD appropriations bill included $631 million for the Secretary of HUD to lend under Section 202 and $1.6 billion for rent subsidies under Section 8. The President deferred approximately $600 million in construction loan money and all but $12.8 million of the rent subsidies.

The Community Development Block Grant ("CDBG") program originated in Title I of the Housing and Community Development Act of 1974. 42 U.S.C. § 5301 et seq. (1982 & Supp. I 1983 & Supp. II 1984). The CDBG program was designed to consolidate a number of grant programs providing federal assistance to local governments with funds to, *inter alia*, acquire property, construct public facilities, rehabilitate housing, support economic development projects, and extend social and health services to low income people. The CDBG program allocation for fiscal year 1986 was $3.1 billion. The President deferred $500 million.

The final program affected was created by Section 312 of the Housing Act of 1964, as amended, 42 U.S.C. § 1452b (1982 & Supp. I 1983) ("Section 312"). Under Section 312, the Secretary lends funds to assist in the rehabilitation of single- and multi-family residential property in low-income neighborhoods. Typically, cities or local public agencies administer the program, lending money to low- and middle-income people who will occupy the housing they will use the funds to rehabilitate. For fiscal year 1986 Congress appropriated no new funds for the Section 312 program, but instead directed that all funds remaining in the program, $166 million, should be made available for new loans in 1986. The President has deferred $135 million of the sum.

Plaintiffs have submitted numerous affidavits—of mayors, city managers, directors of local public agencies, and intended beneficiaries of the depleted programs—attesting to the observable impact the budget deferrals have had and will have on local affairs. The affidavits assert (presently without contradiction), for example, that only a fraction of the eligible low-income families will receive Section 8 assistance this year; that no elderly or handicapped people will receive rent subsidies; and that no loans to rehabilitate housing in depressed neighborhoods will be made. The mayors and city managers state that they have had to cut their CDBG programs, necessitating the layoff of staff and a substantial reduction in such social and health services as shelters for the homeless, meals to elderly, public transportation for the elderly and handicapped, job training, health and dental care for low-income people, and child care for single parents.

In deferring the expenditure of appropriated funds the President acted pursuant to the Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, 88 Stat. 297, or more precisely, Title X of the Act, also known as the Impoundment Control Act of 1974 (the "Act" or "ICA"), Pub.L. No. 93–344, §§ 1001–1017, 88 Stat. 297, 323–37 (codified at 2 U.S.C. §§ 681–688 (1982 & Supp. II 1984)). Under the Act the President can impound funds in two ways. First, he may propose to "rescind," or cancel, all or part of the budget authority Congress has appropriated for a particular program. 2 U.S.C. § 683. To propose a rescission the President must send a special message to Congress detailing the amount of the proposed rescission, the reasons for it, and a summary of the effects the rescission would have on the programs involved. Congress then has 45 days within which to approve the proposed rescission by a "rescission bill" that must be passed by both houses. *Id.* If it fails of approval, the President must allow the full amount appropriated to be spent.

The Act's second device enabling the President to impound funds is one of "deferral," or delay, of the budget authority appropriated. 2 U.S.C. § 684. The President or certain subordinate officers of the

Executive Branch may propose to defer the expenditure of funds without advance congressional approval, but the President must promptly notify Congress of the deferral, the reasons for the deferral, the impact the deferral will have on the programs involved, and "any legal authority invoked by him to justify the proposed deferral." 2 U.S.C. § 684(a)(4). The statute as written, however, allows a deferral to be overridden by a resolution of disapproval passed by either House.

■ It is this latter provision of the Act that plaintiffs challenge as unconstitutional, allowing, as it does, for a so-called one-House legislative veto of impoundments proposed by the President. Defendants concede, of course, that a one-House veto is unconstitutional under the Supreme Court decision in *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), but they argue that the morbid provision alone may be excised from the Act, leaving the remainder of the statute intact, including the deferral authority itself. Plaintiffs vigorously dispute the severability of the one-House veto from the grant of power it was expected to contain, contending that Congress would never have passed a statute conferring such authority without it. The principal question presented, therefore, is whether the one-House veto is discretely severable from the rest of the ICA, and if

3. Defendants also suggest that plaintiffs are without standing to force adjudication of the issue, because not all have demonstrated any direct injuries they have themselves suffered as a result of the deferrals or shown how they would benefit if the relief prayed were granted. It is now well-settled, however, that if one plaintiff has standing to bring an action, a court need not consider the standing of all other plaintiffs before addressing the merits. *See, e.g., Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Buckley v. Valeo,* 424 U.S. 1, 12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976) (*per curiam*). The Court's review of the interests asserted in the several cases before it discloses that at least one plaintiff is immediately concerned with each of the programs affected by the deferrals and will likely benefit if the funds are restored.

4. The statute at issue in *Chadha* contained a severability clause; the ICA contains no such

not, how much other statutory tissue must accompany it.[3]

## II.

■ In *Chadha,* the Supreme Court ruled that "invalid portions of a statute are to be severed ' "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." ' " 462 U.S. at 931–32, 103 S.Ct. at 2774, quoting *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)). The presence of a severability clause in the legislation creates a presumption of severability, *id.* 462 U.S. at 932, 103 S.Ct. at 2774, and a "provision is further presumed severable if what remains after severance 'is fully operable as a law.' " *Chadha,* 462 U.S. at 934, 103 S.Ct. at 2775, quoting *Champlin,* 286 U.S. at 234, 52 S.Ct. at 564.[4]

The Court of Appeals for this circuit has recently had occasion to apply *Chadha* in *Alaska Airlines, Inc. v. Donovan,* 766 F.2d 1550 (D.C.Cir.1985), *cert. granted,* — U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986), in a severability case.[5] Holding that the proponents of inseverability had not met their burden of overcoming the

clause, but its absence is not dispositive, merely evidence of congressional intent. In considering the ICA Congress, anticipating *Chadha,* recognized that the one-House veto provision might be held unconstitutional, but it did not even discuss the addition of a severability clause. *See, e.g.,* H.R.Rep. 93–658, 1st Sess. 87 (1973) (minority views) (one-House veto was "of doubtful legal effect").

5. *Alaska Airlines* reversed a district court decision holding the reservation of a one-House veto over agency regulations implementing an employee protection program in deregulatory legislation to be inseverable from the program itself. The court of appeals found the program, as established by the statute, to be fully operable with or without the oversight afforded by the one-House veto, and the program, rather than the oversight, the dominant legislative objective.

presumption of severability, the court articulated the analytical process it would follow:

> Our charge is to save as much of the statute as we can, consistent of course with the underlying legislative intent. Only if we conclude that Congress would not have included a provision absent the constitutionally flawed portion is that provision to fall. The issue cannot be whether Congress preferred the statute with the unconstitutional provision over the same statute without that provision. Manifestly, Congress' preference is abundantly clear from its inclusion of the unconstitutional provision. Nor is the question whether Congress would have passed some alternative version of the statute if it knew that it could not lawfully have included the offending provision. That is, "the question is not whether Congress would have enacted th[is] *exact* statute[ ] had it known at the time of enactment that the legislative veto provisions were invalid, but rather, whether Congress would have preferred th[is] statute[ ], after severance of the legislative veto provision[ ], to no statute[ ] at all." *Gulf Oil Corp. v. Dyke*, 734 F.2d 797, 804 (T.E.C.A.) (emphasis in original), *cert. denied*, — U.S. —, 105 S.Ct. 173, 83 L.Ed.2d 108 (1984).

766 F.2d at 1560 (footnote omitted).

A similar analysis is apposite here, but it points ineluctably to a contrary conclusion as to the severability *vel non* of the one-House veto, without more, from the ICA. This case involves a statute vastly different in origin, purpose, and effect. As the very title of the Act suggests, a search for means by which Congress could wrest *control* over the budget from what it perceived as a usurping Executive was the *raison d'etre* of the entire legislative effort. Control—how to regain and retain it—was studied and debated at length, on the floor and in committee, over a period of years by a Congress virtually united in its quest for a way to reassert its fiscal prerogative. A clearer case of congressional intent—obsession would be more accurate—is hard to imagine.

■ Before examining the documentary legislative history of the ICA, a digression into the historical political context in which it was conceived is necessary. In the early 1970's, President Nixon began to use impoundments as a means of shaping domestic policy to his liking, withholding funds from various programs he did not favor. The legality of these impoundments was repeatedly litigated, and by 1974, impoundments had been vitiated in more than 50 cases and upheld in only four.[6]

Congress was incensed at what many members regarded as an unconstitutional arrogation of budgetary power by President Nixon.[7] Realizing that case-by-case adjudications were both inefficient and unpredictable, it began consideration of definitive legislation for impoundment control. *See* Abascal and Kramer, *Presidential Impoundment Part II: Judicial and Legislative Responses*, 63 Geo.L.J. 149, 169 (1974). In 1972 Congress established a Joint Study

---

6. *See, e.g., Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975) (municipal waste treatment projects); *Guadamuz v. Ash*, 368 F.Supp. 1233 (D.D.C.1973) (environmental and housing rehabilitation funds); *National Council of Community Mental Health Centers, Inc. v. Weinberger*, 361 F.Supp. 897 (D.D.C.1973) (public health funds). For a complete list of impoundment cases, see Staff of Joint Comm. on Congressional Operations, 93d Cong., 2d Sess., *Special Report on Court Challenges to Executive Branch Impoundments of Appropriated Funds* (Comm.Print 1974); Staff of House Comm. on Government Operations, 93d Cong., 2d Sess., *Report on Presidential Impoundment of Congressionally Appropriated Funds: An Analysis of Recent Federal Court Decisions* (Comm.

Print 1974). *See also* Note, *Addressing the Resurgence of Presidential Budgetmaking Initiative: A Proposal to Reform the Impoundment Control Act of 1974*, 63 Tex.L.Rev. 693, 697 n. 24 (1985) (hereinafter cited as "Note, Texas Law Review").

7. *See generally Joint Hearings on Impoundment of Appropriated Funds by the President Before the Ad Hoc Subcomm. on Impoundment of Funds of the Senate Comm. on Government Operations and the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary*, 93d Cong., 1st Sess. (1973); and *Hearings on Executive Impoundment of Appropriated Funds Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary*, 92d Cong., 1st Sess. (1971).

Group on Budget Control to study the matter and make recommendations to Congress; the Group's report, issued the following year, called for wide-ranging reform of the budget process. Joint Study Comm. on Budget Control, 93d Cong., 1st Sess., *Recommendations for Improving Congressional Control Over Budgetary Outlay and Receipt Totals* (Comm.Print 1973). In 1973 both Houses first proposed their own bills.

It is apparent from historical circumstances alone that the legislation to which Congress was building would be designed and expected to mark the limits of Congressional and Presidential power in the matter of impoundments henceforth, beyond the incumbency of the then-President, at the time preoccupied with the aftermath of Watergate, who had, by the time the legislation was being readied, forsworn the use of impoundments for the duration of his administration altogether. Note, Texas Law Review, at 703–04 n. 62. Congress was intent upon recovering its primacy in matters of money and spending for all time.

In 1973 the Senate passed a bill that purported to give the President limited authority to impound appropriations for 60 days, provided that the appropriation be available for obligation at the end of 60 days if its impoundment were not approved by Congress by concurrent resolution. S. 373, 93d Cong., 1st Sess., passed Senate, 119 Cong.Rec. 15,255 (1973). That same year the House passed a bill containing anti-impoundment measures giving the President authority to cancel or delay budget authority upon notice to Congress of his action, subject, however, to a one-House veto. H.R. 7130, 93d Cong., 2d Sess., passed House, 119 Cong.Rec. 39,740 (1973).

In 1974 the Senate unanimously adopted the House bill after substituting for the one-House veto the language of a new Senate bill, S. 1541, 93d Cong., 2d Sess. (1974), which forbade impoundments altogether. 120 Cong.Rec. 7938 (1974). (S. 1541 would have required the President to propose *rescissions* whether he wished to evade, or merely delay, budget authority.) The bill also purported to amend the Anti-Deficiency Act to eliminate any possible basis for its invocation by a President as authority for impoundments.[8]

In conference committee a compromise was reached that included features of both the House and Senate bills, and the conference committee report makes it clear that the Houses were equally committed to confining a President's power to impound appropriations and to restore to Congress ultimate control over the budget process. *See* S.Conf.Rep. No. 93–924, 93d Cong., 2d Sess. 49, 76–78 (1974), U.S.Code Cong. & Admin.News 1974, p. 3462. The compromise bill adopted the Senate approach for rescissions, or permanent impoundments, requiring approval through the enactment of legislation. It employed the House approach for deferrals, or temporary impoundments, allowing the deferrals to become effective unless disapproved by either House. The compromise bill also incorporated an amendment to the Anti-Deficiency Act similar to that proposed by the Senate bill.

The ensuing debates upon the compromise conference bill in both Houses demonstrate near-unanimous consensus on the part of the members that total congressional control over the impoundment process would be a legislative *sine qua non*. Without a ready device to quash any impound-

---

**8.** The Anti-Deficiency Act is codified at 31 U.S.C. §§ 1341 and 1512 (1982). Prior to its amendment in 1974, the Anti-Deficiency Act permitted the President to "apportion" funds where justified by "other developments subsequent to the date on which such appropriation was made available." 31 U.S.C. § 665(c)(2) (1970) *amended by* Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, Tit. X. § 1002, 88 Stat. 297, 332. President Nixon relied on this section as authorization for the impoundments he made. Note, Texas Law Review, at 699–700. The Act was amended to limit apportionments to provision for contingencies, to achieve savings made possible by changes in requirements or program efficiency, or as specifically provided by law. 31 U.S.C. § 1512(c)(1). The amendment was part of the overall reform of the budget process, and was intended to prohibit the use of apportionment as an instrument of policy-making. *See, e.g.,* 120 Cong.Rec. 7658 (1974) (remarks of Senator Muskie).

ment of which it disapproved—temporary or permanent—Congress was of no mind to concede to any President a warrant to impound at all.

Representative Brotzman, for example, said:

> Until now, the President's impoundment of funds has been the only thing keeping this spending under control. I believe that impoundment of funds ultimately works to the detriment of every American citizen by weakening the separation of powers between the executive and legislative branches.
>
> However, if the Congress were to destroy this power to impound funds, without first providing the machinery to responsibly handle the Federal budget, the result would be bankruptcy for the American people.
>
> There must be a mechanism in the Congress to effectively limit congressional spending and this bill accomplishes the goal....
>
> The bill permits the President to impound funds solely for contingencies or to affect [sic] certain savings. The President is required to report any impoundment action to the Congress by means of a deferral message, and the Congress is given the right to pass an impoundment resolution disapproving the deferral, thereby making the funds available for their intended purpose.

120 Cong.Rec. 19,685–86 (1974). Representative Randall termed impoundment control one of the "tools for budget control," and also an important "tool to fight the impoundment process of funds appropriated needed to carry out authorized programs so urgently needed by our people." *Id.* at 19,686–87. Representative Sisk expressed his belief that congressional appropriations needed protection from executive impoundment, stating "the Congress has the opportunity to stop the arrogation of power of the Nation's purse strings," and "[t]here are several significant provisions in the budget control bill, but none are as important as the prohibition against impoundment by executive fiat...." *Id.* at 19,687. Representative O'Neill emphasized the importance of Congress' ability under

the compromise bill "to review and terminate the impoundment of funds by the executive branch" and to determine whether impoundments are necessary. *Id.* at 19,-689. Numerous statements from other representatives declare support in like terms for the compromise bill and the need for control of Presidential impoundments. *See, e.g., id* at 19,680 (Rep. Sikes); *id.* at 19,684 (Rep. Pickle); *id.* (Rep. Bingham); *id.* at 19,685 (Rep. Badillo); *id.* at 19,690 (Rep. Annunzio); *id.* at 19,695 (Rep. Pepper); *id.* at 19,696 (Rep. Matsunaga).

Senator Tower also declared his approval of congressional control of impoundments, saying that control of the President's ability to impound "should help restore a better balance between the executive and legislative branches of government." *Id.* at 20,-485. Other senators concurred. *See, e.g., id.* at 20,470–71 (Sen. Metcalf); *id.* at 20,-472–73 (colloquy between Sen McClellan and Sen. Ervin); *id.* at 20,476 (Sen. Cranston); *id.* at 20,481 (colloquy between Sen. Humphrey and Sen. Ervin); *id.* at 20,485 (Sen. Tower).

The one-House veto was specifically extolled as an integral component of the control machinery being considered. On the House side numerous statements by representatives illustrate the importance they attached to it. Rep. Bolling's statement in support of the conference bill is an example:

> From the start I have held to the position that impoundment control is an essential component of budget reform. It makes no sense for Congress to establish new procedures for the appropriation of funds if the President can override the will of Congress by means of impoundment. At the same time, the methods used to control Presidential impoundments must be reasonable and appropriate. They should neither deny the President the capability to manage the executive branch nor impose upon Congress the burden of redoing its previous decisions. In line with this position, the House last year passed H.R. 8480 to provide for the veto of any impoundment by either the House or Senate and a similar

provision was incorporated into H.R. 7130 when it was approved by the House last December.

I can report that the conference bill both upholds the position of the House and makes some worthwhile elaborations in the procedures of expenditure control. The bill addresses the various types of impoundments and provides appropriate procedures for each. First, it provides for disapproval by either the House or the Senate of Presidential proposals to defer the expenditure of funds. Analysis has shown that deferrals constitute the lion's share of impoundment actions and many of these are for routine financial purposes and involve neither questions of policy nor attempts to negate the will of Congress. In the case of deferrals, disapproval can be expressed by resolution of either the House or the Senate. Such disapproval will clearly instigate [sic] the view of Congress that the deferral is not merely a routine financial matter. When disapproved by either House or Senate, a deferral must cease at once.

120 Cong.Rec. 19,674 (1974).

Similar sentiments were expressed in the Senate. Senator Ervin, a member of the conference committee, reported his satisfaction with the impoundment control portion of the compromise bill and stated that the "highly controversial issue" of impoundment control "is dealt with by way of an effective compromise." *Id.* at 20,464. He noted that "the President has no power under the Constitution to impound lawfully appropriated funds in the absence of a delegation of such authority by the Congress," but that there were situations in which deferral or rescission of budget authority was the best policy. *Id.* Therefore, he said, the compromise bill addresses "three types of executive actions and places *restrictions on each of them.*" *Id.* (emphasis added).[9]

Thus, unlike the challenged provision of the statute in *Alaska Airlines,* the one-House veto is not to the ICA merely a superfluous afterthought; it is, rather, the instrument expressly chosen by a nearly unanimous Congress to exert its control over impoundments-by-deferral when proposed by the President.[10]

Defendants' contention that the primary objective of Congress in passing the Act was to improve the quality of the information it would receive about proposed deferrals in the accompanying "message" is simply not borne out by the legislative history. To be sure, Congress wanted notice of Presidential budgetary actions, and there are expressions during the debates of dissatisfaction with the sufficiency of Presidential communications under prior law,[11] but it was the notice provision, not the veto, if anything, which was merely incidental. The debates centered upon the issue of whether the President should be

---

**9.** The one-House veto had also been discussed in the floor debates on the original bills, with members expressing similar views. *See, e.g.,* 119 Cong.Rec. 39,341 (1973) (remarks of Rep. Bolling); *id.* at 39,363 (remarks of Rep. Hammerschmidt); *id.* at 39,725 (remarks of Rep. Whitten); *id.* (remarks of Rep. Eckhardt); *id.* at 39,725–26 (amendment to replace one-house veto provision with concurrent resolution provision rejected); 120 Cong.Rec. 7657 (1974) (remarks of Sen. Roth); *id.* at 7657–59 (colloquy between Sen. Roth and Sen. Muskie); *id.* at 7659 (amendment to permit one-House veto rejected).

The Court has neither been cited to, nor has found on its own, *any* expressions of support for the proposition that the President be allowed to defer budget authority *without* the check afforded by *at least* a one-House veto.

**10.** The compromise bill passed the House 401 to 6, 120 Cong.Rec. 19,698 (1974); the Senate 75 to

0. 120 Cong.Rec. 20,500 (1974). Such opposition as there was came from House members who advocated adoption of the Senate's earlier version refusing all impoundment authority to the President. *See, e.g.,* 120 Cong.Rec. 19,693 (1974) (Rep. Harrington); *id.* at 19,696 (Rep. Drinan).

**11.** *See* 120 Cong.Rec. 20481–82 (colloquy between Sen. Humphrey and Sen. Ervin). Two years earlier, Congress had passed a law designed to require the President to submit information about impoundments to Congress. Federal Impoundment and Information Act of 1972, Pub.L. No. 92–599, 86 Stat. 1325 (codified at 31 U.S.C. § 581c–1 (1970 & Supp. II 1972), *repealed by* Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, Tit. X, § 1003, 88 Stat. 297, 332.

able to impound at all, or should be permitted to impound, but with various congressional circumscriptions of his power to do so. It does not appear from the voluminous history of the ICA in its entirety that Congress was very much concerned with, let alone determined to achieve, further detail about future Presidential impoundments absent a mechanism for exercising control over them.

### III.

■ In *Alaska Airlines* the court noted that the statute without the one-House veto would operate as intended. In doing so it distinguished *American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C.Cir.1982), an earlier case in which it had found a one-House veto inseverable because severance would have left a legislative result the opposite of that Congress intended.[12] Severance in the instant case, too, would demolish the congressional control over a species of impoundment that was at its heart.

Indeed, if the Court were to find the one-House veto to be severable from the deferral power itself, not only would it confirm in the President the very power that Congress has never acknowledged him to have at all, it would also enable him to employ it, in effect, as a "line-item veto" (which is, of course, anathema to Congress) by signing an appropriations bill and later "deferring" any and all specific appropriations for agencies or programs he thought

undeserving. That neither this nor any President has done so to date is irrelevant; the potential for it is, however, most relevant to a retrospective inquiry into Congress' willingness in 1974 to have accepted an ICA shorn of the one-House veto but in all other respects as it appears today.

Defendants point out that the deferral power can never be the true equivalent of a line-item veto, in that an enactment "vetoed" by the President is permanently canceled, whereas an appropriation "deferred" must be available for obligation before the end of the fiscal year. *See* 2 U.S.C. § 684(a). The argument ignores the practical realities of the budget process, however, for when the expenditure of funds is deferred for one year, those funds remain available and may be used to offset budgetary requirements for the following fiscal year.[13] The argument also ignores economic reality as well; the timing of an expenditure may be as or more important to Congress than the total amount spent.

Plaintiffs postulate two further anomalous, although still hypothetical, consequences of a President uninhibited by the prospect of a one-House veto in his exercise of the deferral authority given him by the ICA. Having no other mechanism at hand, the only way Congress can reverse a Presidential deferral is by enacting new legislation ordering the President to spend the money (an alternative, by the way, Congress specifically considered and discarded when it passed the ICA).[14] If the new

---

**12.** In *Pierce,* at issue was a provision of an appropriations act for HUD which provided that no funds could be used for a reorganization of HUD without the prior approval of the Appropriations Committees of both Houses. The court of appeals found the approval clause invalid but inseverable, basing its decision on the act's legislative history from which it derived its belief that "[n]either House ... would have accepted a complete ban on reorganizing HUD—yet that is precisely the result severance would have brought about." *Alaska Airlines,* 766 F.2d at 1565.

**13.** In his Section 8 deferral message to Congress, the President stated that he intended to use appropriations deferred from fiscal year 1986 to offset appropriations for fiscal year 1987. *See* H.Doc. 99–161 at 246; 51 Fed.Reg. 5953. *See also* Summary, Fiscal Year 1987 Bud-

get, U.S. Department of Housing and Urban Development, H–2, H–4, and H–14.

**14.** The House Report accompanying H.R. 7130 stated that a one-House veto provision "is suggested on the ground that the impoundment situation established by the bill involves a presumption against the President's refusing to carry out the terms of an already considered and enacted statute. To make Congress go through a procedure involving agreement between the two Houses on an already settled matter would be to require both, in effect, to reconfirm what they have already decided." H.R.Rep. No. 93–658, 93d Cong., 1st Sess. 42 (1973), U.S.Code Cong. & Admin.News 1974, pp. 3462, 4387. Ultimately, this objection prevailed with respect to deferrals. *See* S.Rep. 93–924 (1974) (Conference Committee Report), 2 U.S.C. § 684.

legislation were then vetoed by a President determined to prevail, Congress would have to muster a two-thirds majority of each House to vote to override. Plaintiffs also suggest that unconstrained deferral authority pursuant to the ICA would, in effect, nullify Congress' amendment to the Anti-Deficiency Act.[15] The amendment limited the President's ability to "apportion" funds to three carefully-delineated situations in an effort to remove any colorable basis under the Anti-Deficiency Act for his impoundment of appropriated funds in the guise of an "apportionment." To find the President now unchecked in his deferral power by the one-House veto would be to permit him to apportion funds in the guise of a "deferral."

The Court concludes that the legislative history of the ICA demonstrates that Congress would not have conceded any deferral authority to the President at all in the absence of the one-House veto provision. It can be said with conviction that Congress would have preferred no statute to one without the one-House veto provision, for with no statute at all, the President would be remitted to such pre-ICA authority as he might have had for particular deferrals which, in Congress' view (and that of most of the courts having passed upon it) was not much.

## IV.

 Having found it evident that Congress would not have enacted those provisions of the ICA which are within its power independently of that which is not, under *Chadha* and *Alaska Airlines* this Court must now look to whether the ICA is presently fully operable as a law without the one-House veto provision. In support of their contention that the ICA is a law entire unto itself *sans* the one-House veto, defendants point to the way in which Congress and the President have operated under the ICA since *Chadha*.[16] But, the fact that both Houses of Congress have either

acquiesced in, or passed legislation to overturn, other Presidential deferrals in the three years since *Chadha* does not establish that *the law* is operable. The ICA does not provide the mechanism for the enactment of legislation; the Constitution does. That Congress has done so proves not that the statute is operable, but that Congress has acted outside the confines of the statute and in the exercise of its Article I constitutional powers. The Court finds that the ICA is not fully operable as a statute without the one-House veto provision. The *modus vivendi* which has evolved between the President and Congress in the years intervening, ostensibly pursuant to the ICA, could in fact have existed in the absence of any statute at all.

## V.

 Defendants assert that if this Court finds that the one-House veto is inseverable, it must then strike all other impoundment-related provisions of Title X of the ICA, including the amendment to the Anti-Deficiency Act, and thereby return the parties to the *status quo ante* the ICA's enactment in 1974. They argue that to strike only the deferral provision would be to destroy the symmetry of the constitutional accommodation the Act represented between the Executive and Legislative Branches with respect to the whole subject of Presidential impoundments.

The Court of Appeals for this circuit, however, has instructed that courts must "save as much of the statute as we can, consistent with the underlying legislative intent," *Alaska Airlines, Inc. v. Donovan*, 766 F.2d at 1560 (footnote omitted), and the excision of more than the deferral authority would constitute unnecessary mutilation. The paramount legislative objective of the ICA, i.e., of controlling impoundments, is best implemented by leaving rescission authority and the Anti-Deficiency Act as writ-

---

**15.** See footnote 8, *supra.*

**16.** Through fiscal 1985 the President had proposed 152 deferrals, of which Congress has disallowed 21 by legislation which the President has signed into law.

From 1975 through mid-1983, of over 1,000 Presidential deferrals, Congress rejected 100, by one-House veto or subsequent legislation.

ten, and as the President and Congress agreed upon them originally.

## VI.

Finally, defendants contend that a finding that the one-House veto provision is inseverable will not provide the plaintiffs the relief they seek, *viz.*, the present availability to them of the total appropriations for obligation, because the statutes pursuant to which the appropriations were made do not mandate the expenditure of funds now and, thus, the President may withhold the funds independently of the ICA. *See UAW v. Donovan*, 746 F.2d 855 (D.C.Cir. 1984). But the President acted pursuant to the ICA in deferring the budget authority at issue here. He did not assert an independent basis for his deferrals, *see* H.Doc. 99–161; 51 Fed.Reg. 5829 (Feb. 18, 1986), and the Court can decide only the matters presented to it by the actual case or controversy before it. The status of the President's authority to impound funds independently of the ICA will once again have to await yet another case.

For the foregoing reasons, it is, this 16th day of May, 1986,

ORDERED, that plaintiffs' motions for a preliminary injunction are denied as moot; and it is

FURTHER ORDERED, that defendants' motion for summary judgment is denied; and it is

FURTHER ORDERED, that plaintiffs' motions for summary judgment are granted; and it is

FURTHER ORDERED, that the one-House veto provision is hereby declared inseverable from the remainder of section 1013 of Pub.Law 93–344, codified at 2 U.S.C. § 684 (1982), and section 1013 is therefore set aside in its entirety; and it is

FURTHER ORDERED, that defendants are ordered to make available for obligation the full amount of funds Congress appropriated for (a) the Section 8 Housing Assistance Payments Program, 42 U.S.C. § 1437f; (b) the Section 202 Program of the Housing Act of 1959, 12 U.S.C. § 1701q; (c) Title I of the Community Development Block Grant Program of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301; and (d) the Section 312 Program of the Housing Act of 1964, 42 U.S.C. § 1452b, which defendants have withheld pursuant to the deferral messages sent by the President to the Congress; and it is

FURTHER ORDERED, *sua sponte*, that the injunction hereinabove entered is stayed until completion of appellate proceedings herein.