**CITY OF NEW HAVEN, CONNECTICUT**

**v.**

**UNITED STATES of America, Appellant.**

**NATIONAL LEAGUE OF CITIES, et al.**

**v.**

**Samuel R. PIERCE, Jr., Secretary of H.U.D., et al., Appellants.**

**CITY OF CHICAGO, a municipal corporation, et al.**

**v.**

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Appellants.**

**Nos. 86–5319 to 86–5321.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1986.

Decided Jan. 20, 1987.

As Amended Jan. 20, 1987.

Douglas Letter, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., James M. Spears, Deputy Asst. Atty. Gen. and Robert E. Kopp, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellants in Nos. 86–5319, 86–5320 and 86–5321.

Neil Proto, with whom Edward R. Venit, Washington, D.C., was on the brief for appellee, City of New Haven in No. 86–5319.

David C. Vladeck, with whom Alan B. Morrison, Eric R. Glitzenstein, Cynthia Pols, Washington, D.C., Joel D. Stein, Craig J. Hanson and Amy L. Beckett, Chicago, Ill., were on the joint brief for appellees, National League of Cities, et al. in Nos. 86–5320 and 86–5321.

Before EDWARDS and BORK, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, we are called upon to decide the extent of the President's *statutory* authority to delay (or "defer") the expenditure of funds appropriated by Congress. Under section 1013 of the Impoundment Control Act of 1974 ("ICA" or the "Act"), 2 U.S.C. § 684 (1982), the President must indicate his intention to defer a congressional appropriation by sending a "special message" to Congress. In that message, the President is required to justify the deferral and specify its amount, its intended length and its probable fiscal consequences. Under the Act, if either House of Congress passes an "impoundment resolution" disapproving the "proposed" deferral, the President is required to make the funds available for obligation. If neither House acts, the deferral takes effect automatically, although it may not last beyond the end of the fiscal year.[1]

The majority of proposed deferrals are routine "programmatic" deferrals, by which the Executive Branch attempts to meet the inevitable contingencies that arise in administering congressionally-funded agencies and programs. Occasionally, however, the President will seek to implement "policy" deferrals, which are intended to advance the broader fiscal policy objectives of the Administration. The critical distinction between "programmatic" and "policy" deferrals is that the former are ordinarily intended to *advance* congressional budgetary policies by ensuring that congressional programs are administered efficiently, while the latter are ordinarily intended to *negate* the will of Congress by substituting the fiscal policies of the Executive Branch for those established by the enactment of budget legislation.[2]

In the instant case, the President invoked section 1013 as authority for implementing four separate policy deferrals. In particular, the President deferred the expenditure

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. While the statute by its terms only permits the President to "propose[ ]" the deferral of funds, the effect of the statute is to permit the President to implement a deferral of up to one year until such time as Congress acts to disapprove the deferral.

2. As a hypothetical example, one might consider a congressional appropriation of $10,000,000 to construct a new highway between Washington, D.C. and New York. If inclement weather threatened completion of the construction project, the President might seek to defer the expenditure of the appropriated funds for "programmatic" reasons. However, if the President believed that the project was inflationary, he might attempt to delay the expenditure of the funds for "policy" reasons.

of funds earmarked for four housing assistance programs to be administered by the Department of Housing and Urban Development ("HUD"). The appellees—various cities, mayors, community groups, members of Congress, associations of mayors and municipalities and disappointed expectant recipients of benefits under the four programs—brought these consolidated actions challenging the authority of the President to implement policy deferrals pursuant to section 1013.[3] That challenge was based on the inclusion in the statute of a legislative veto provision of the type held unconstitutional by the Supreme Court in *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). According to the appellees, the unconstitutional legislative veto provision contained in section 1013 rendered the *entire* section invalid, leaving the President without statutory authority on which to base the deferrals in question. The appellees requested a declaratory judgment that section 1013 was void in its entirety and an injunction obligating the nominal defendants (the United States, the Secretary of HUD and the Director of the Office of Management and Budget) to release the funds appropriated by Congress for the four HUD programs.

After carefully analyzing the intent of Congress in enacting section 1013, the District Court held that the section's unconstitutional legislative veto provision was inseverable from the remainder of the section. *City of New Haven v. United States,* 634 F.Supp. 1449 (D.D.C.1986). Accordingly, it declared section 1013 void in its entirety and ordered the defendants-appellants to make the deferred funds available

for obligation. *Id.* at 1460. Shortly thereafter, however, the President signed into law legislation overturning the challenged deferrals.[4] Pursuant to this legislation, the funds deferred by the President have been made available for obligation.

For much the same reasons offered by the District Court in its thorough and able opinion, we hold that the unconstitutional legislative veto provision in section 1013 is inseverable from the remainder of that section. We therefore affirm the District Court's declaratory judgment striking down section 1013 in its entirety. We hold, however, that the request for injunctive relief is now moot.

## I. BACKGROUND

In November of 1985, President Reagan signed HUD's fiscal year 1986 appropriations bill.[5] Included in that bill were appropriations for four programs administered by HUD: the Community Development Block Grant Program, under which HUD makes grants to state and local governments for community development projects;[6] the Section 8 Housing Assistance Payments Program, under which HUD provides subsidies (through public housing agencies) to low-income families to enable them to obtain low-cost housing;[7] the Section 312 program, under which HUD lends money (typically to cities or local public agencies) to be used to rehabilitate residential property in low-income neighborhoods;[8] and the Section 202 program, under which HUD lends money to rehabilitate low-cost rental units for the

---

3. As will be seen shortly, the President need not rely on section 1013 as authority for making routine programmatic deferrals without prior congressional approval. Although the President must *report* programmatic deferrals to Congress under the procedures outlined in section 1013, the President has separate statutory authority under the Anti-Deficiency Act to implement such deferrals. *See* note 18 *infra.* Thus, while the appellees seek to void section 1013 in its entirety, they in effect challenge only the authority of the President to implement *policy* deferrals without prior congressional approval.

4. Urgent Supplemental Appropriations Act, 1986, Pub.L. No. 99–349, 100 Stat. 710.

5. Act approved Nov. 25, 1985, Pub.L. No. 99–160, 99 Stat. 909.

6. 42 U.S.C. § 5303 (1982 & Supp. I 1983).

7. 42 U.S.C. § 1437f (1982 & Supp. II 1984).

8. 42 U.S.C. § 1452b (1982 & Supp. III 1985).

handicapped and the elderly.[9] In February of 1986, the President sent impoundment notices to Congress pursuant to section 1013 announcing his intention to defer the expenditure of funds for these four programs. One of the reasons provided by the President for the deferrals was to bring 1986 spending levels into line with the Administration's 1987 proposed budget. *See* 51 Fed.Reg. 5953–58 (1986). Previously, the President had failed in his efforts to convince Congress to drastically reduce these expenditures in its 1986 budget. Thus, it is not disputed that the deferrals were made for "policy" reasons.

Because the President relied solely on section 1013 as authority for the deferrals, the District Court was faced squarely with the question whether the unconstitutional legislative veto provision in section 1013 is severable from the remainder of that section. This question, the District Court recognized, was purely one of congressional intent. Specifically, the court was required to consider what Congress *would have done* had it known at the time it passed section 1013 that the legislative veto provision was unconstitutional. Would Congress nonetheless have conferred deferral authority on the President, even though it could not exercise control over that authority by means of a legislative veto? Or would Congress have refused to confer deferral authority on the President, preferring "no statute[ ] at all"[10] to a statute that permitted the President to defer funds without the check of a legislative veto?

After thoroughly examining the statutory language, the legislative history and the historical political context surrounding passage of the Act, the District Court had little difficulty concluding that Congress would have preferred no statute at all to a statute that conferred unchecked deferral authority on the President. Beginning with the title of the statute itself, and continuing with an analysis of the statute's

legislative history, the court found that the *"raison d'etre"* of the entire legislative effort was to wrest *control* over the budgetary process from what Congress perceived as a usurping Executive:

> Control—how to regain and retain it— was studied and debated at length, on the floor and in committee, over a period of years by a Congress virtually united in its quest for a way to reassert its fiscal prerogative. A clearer case of congressional intent—obsession would be more accurate—is hard to imagine.

634 F.Supp. at 1454.

In the course of its analysis, the District Court cited numerous statements by individual legislators illustrating Congress' anger at frequent presidential impoundments and its preoccupation with *limiting* the President's authority to override duly enacted budget legislation. *Id.* at 1455–58. The court also noted that these same sentiments were expressed in the Conference Committee Report. *Id.* at 1455 (citing S. Conf.Rep. No. 924, 93d Cong., 2d Sess. 49, 76–78, *reprinted in* 1974 U.S. Code Cong. & Admin News 3462, 3591, 3616–18). In contrast, the trial court was unable to find a single legislative expression of support for the proposition "that the President be allowed to defer budget authority *without* the check afforded by *at least* a one-House veto." *Id.* at 1457 n. 9 (emphasis in opinion). This overwhelming evidence of congressional intent, the court concluded, conclusively demonstrated that Congress—had it known that it could not disapprove unwanted impoundments by means of a legislative veto—would never have enacted a statute that *conceded* impoundment authority to the President. Indeed, it could be said with "conviction" that Congress would have preferred no statute to one without the one-House veto provision, for with no statute at all, the President would be remitted to such pre–ICA authority as he might have had for particu-

---

**9.** 12 U.S.C. § 1701q (1982 & Supp. II 1984).

**10.** *See Alaska Airlines, Inc. v. Donovan,* 766 F.2d 1550, 1560 (D.C.Cir.1985) (quoting *Gulf Oil Corp. v. Dyke,* 734 F.2d 797, 804 (Temp.Emer.Ct.

App.), *cert. denied,* 469 U.S. 852, 105 S.Ct. 173, 83 L.Ed.2d 108 (1984)), *cert. granted,* —— U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986).

lar deferrals which, in Congress' view (and that of most of the courts having passed upon it) was not much.

*Id.* at 1459.

Having found that the legislative veto provision in section 1013 was inseverable from the remainder of the section, and that the President had therefore relied on an invalid statute in making the policy deferrals in question, the court imposed two remedies. First, it ordered the appellants to make the improperly deferred funds available for obligation. Second, it declared section 1013 void in its entirety. Subsequent to this decision, however, Congress duplicated the District Court's injunctive relief by enacting legislation (signed by the President) disapproving the deferrals and ordering that the funds be made available for obligation.[11] It is in this posture that we review the appellants' appeal from the District Court's Memorandum and Order.

## II. ANALYSIS

### A. *Mootness*

■ The threshold question presented by this appeal is whether the appellees' challenge to the President's exercise of deferral authority under section 1013 was mooted by the recent legislation overturning the HUD deferrals. This question, we find, is governed by our recent decision in *Better Government Association v. Department of State*, 780 F.2d 86, 90–92 (D.C.Cir.1986). In that case, the appellants challenged a set of agency guidelines and an accompanying agency regulation used in determining when an individual or organization requesting information under the Freedom of Information Act ("FOIA") would be entitled to a waiver of search and copying fees. The appellants, who had incurred administrative denials of FOIA fee waiver requests pursuant to the guidelines and regulation, challenged both the facial validity of the guidelines and regulation and the specific determinations to deny their fee waiver

requests. After the appellants filed their complaints, however, the agencies that had originally denied the fee waiver requests reversed their position and granted the requests. We were therefore confronted with the question whether the appellants' challenge to the guidelines and regulation was moot.

We held that the appellants' challenge to the guidelines and regulation *as applied to their specific fee waiver requests* was indeed moot, reasoning that we could not enjoin the appellee agencies to do something they had already done. *Id.* at 91. However, we held that the appellants' challenge to the facial validity of the guidelines and regulation presented a live controversy. *Id.* In so holding, we observed that the appellants' original complaints challenged *both* the specific fee waiver denials *and* the legality of the standards utilized by the agencies in denying their requests. This second claim was not moot, we reasoned, because the appellants were frequent FOIA requesters and because the government had not disavowed reliance on the challenged guidelines and regulation. Indeed, we found that the government "clearly intend[ed] to apply [the] purportedly objectionable standards to FOIA fee waiver requests in the future." *Id.* Thus, the appellants' claim for declaratory relief alleged a continuing injury attributable to the agencies' guidelines and regulation.

In the instant case, the appellees' original complaints similarly challenged both the particular deferrals implemented by the President and the facial validity of the statute under which the President acted. And, as in *Better Government,* the Executive Branch has not disavowed reliance on the challenged statute. Indeed, the appellants frankly concede in their reply brief that they foresee continued reliance by the Executive Branch on the Act as authority for implementing policy deferrals, and that the appellees are likely to be affected by such deferrals in the future.[12] Thus, although the appellees' claim for injunctive relief is

---

11. Urgent Supplemental Appropriations Act, 1986, Pub.L. No. 99–349, 100 Stat. 710.

12. *See* Reply Brief for the Defendants-Appellants at 21.

clearly moot,[13] we must still decide whether the appellees are entitled to declaratory relief on their claim that section 1013 of the Act is facially invalid.[14] It is to this issue that we now turn.

B. *Severability of the Unconstitutional Legislative Veto Provision in Section 1013*

 The appellants concede, as they must, that the legislative veto provision in section 1013 is unconstitutional under the Supreme Court's decision in *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The sole question for decision is whether that unconstitutional provision is severable from the remainder of section 1013, which ostensibly authorizes the President to defer congressional appropriations for a period not exceeding one fiscal year.

Recently, in *Alaska Airlines, Inc. v. Donovan,* 766 F.2d 1550 (D.C.Cir.1985), *cert. granted,* ——— U.S. ———, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986), this circuit had occasion to consider the test for determining when an invalid statutory provision will be found severable from the otherwise valid portions of the statute. In that case, we read the Supreme Court's decision in *Chadha* as establishing a presumption in favor of severability if what remained after severance of the unconstitutional provision

would be "fully operable as law." *Id.* at 1560.[15] That presumption could be overcome, however, by strong evidence indicating that Congress would not have enacted the statute had it known it could not include the unconstitutional provision. *Id.*[16] In this respect, we recognized that the question of severability was ultimately one of congressional intent. While a court was to presume severability, and attempt to "save as much of the statute as [it could]," the ultimate inquiry was whether "Congress would have preferred [the] statute[ ], after severance of the legislative veto provision[ ], to no statute[ ] at all." *Id.* (quoting *Gulf Oil Corp. v. Dyke,* 734 F.2d 797, 804 (Temp.Emer.Ct.App.), *cert. denied,* 469 U.S. 852, 105 S.Ct. 173, 83 L.Ed.2d 108 (1984)).

In the instant case, we assume without deciding that section 1013 is "operable" in the absence of its legislative veto provision. However, even assuming the statute is operable, on the record in this case we must affirm the District Court's judgment on congressional intent, *i.e.,* that Congress would not have enacted section 1013 had it known that the legislative veto provision was unconstitutional. Indeed, to the extent that section 1013 is "operable" absent the legislative veto provision, it operates in a manner wholly inconsistent with the intent of Congress in enacting deferral legis-

---

**13.** Because the appellees' claim for injunctive relief is clearly moot, we do not decide various issues raised by the parties relating to the specific deferrals involved.

**14.** *Cf. Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (proper to consider claim for declaratory relief where need for injunctive relief has been obviated but challenged government practice continues).

**15.** A statutory provision is also presumed severable if Congress has included a "severability clause" in the statute—*i.e.,* a clause expressly stating Congress' intention that other portions of the statute shall remain in effect should a particular statutory provision be found unconstitutional. *See, e.g., Chadha,* 462 U.S. at 932, 103 S.Ct. at 2774. Here, as in *Alaska Airlines,* Congress did *not* include a severability clause in the challenged statute. Although the presence of a severability clause is ordinarily given great

weight, it is unclear from the case law what relevance attaches to the *absence* of a severability clause. *See Alaska Airlines,* 766 F.2d at 1559 n. 7. In the instant case, however, we need not rely on the absence of a severability clause to support our holding of inseverability, because we find that more direct evidence of congressional intent conclusively establishes that Congress would not have intended section 1013 to survive excision of its legislative veto provision.

**16.** The court again relied on *Chadha,* which held that the invalid portions of a statute are to be severed unless it is "evident" that Congress "would not have enacted those provisions which are within its power, independently of [those] which [are] not." 462 U.S. at 931–32, 403 S.Ct. at 2773–74 (quoting *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (quoting *Champlin Ref. Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932))).

lation. We therefore hold that the unconstitutional legislative veto provision in section 1013 is inseverable from that portion of the statute conferring deferral authority on the President.

### 1. Congressional Intent

We assume for purposes of our severability analysis that section 1013 is in a purely technical sense "operable" even without a legislative veto provision. As noted earlier, however, the ultimate inquiry in a severability case is not whether the statute may somehow continue to function after excision of the invalid portion, but rather whether it continues to function *in a manner consistent with congressional intent*. Phrased differently, the question is whether Congress would have intended the statute to operate even in the absence of the invalid provision, or whether it would have preferred no statute at all. In the instant case, the conclusion is inescapable that Congress would have preferred no statute at all to a statute that conferred unchecked deferral authority on the President.

As the District Court observed and catalogued, the ICA was passed at a time when Congress was united in its furor over presidential impoundments and intent on reasserting its control over the budgetary process. 634 F.Supp. at 1454–58. Although the Senate and House initially differed over the precise means for reasserting congressional prerogatives,[17] the legislation that eventually emerged from Congress contained several strong measures expressly designed to limit the President's ability to impound funds appropriated by Congress. For permanent impoundments (or "rescissions"), Congress adopted the Senate approach, which required prior legislative approval of proposed impoundments. *See* 2 U.S.C. § 683 (1982). For temporary impoundments (or "deferrals"), Congress adopted the House approach, which allowed impoundments to become effective without prior approval *if* neither House of Congress passed a resolution disapproving the impoundment. *See* 2 U.S.C. § 684 (1982). Importantly, Congress also amended the Anti-Deficiency Act to preclude the President from relying on that Act as authority for implementing policy impoundments.[18]

It is abundantly clear from both the statute and its legislative history that the overriding purpose of the deferral provision was to permit either House of Congress to veto any deferral proposed by the President—particularly policy deferrals. The title of the statute itself—*"Disapproval of proposed deferrals of budget authority"*—makes it plain that Congress was preoccupied with assuring for itself a ready means of disapproving proposed deferrals. The House Report accompanying H.R. 7130 —from which the deferral provision was drawn—expressly states that the "basic purpose" of the bill was to provide each House an opportunity to veto an impoundment. H.R.Rep. No. 658, 93d Cong., 1st

---

**17.** The bill originally passed by the Senate would have required advance approval by Congress through concurrent resolution if the impoundment was to last beyond 60 days. S. 373, 93d Cong., 1st Sess., 119 Cong.Rec. 15,255–56 (1973). The bill passed by the House would have allowed impoundments to go into effect automatically if neither House of Congress vetoed the impoundment. H.R. 7130, 93d Cong., 1st Sess., 119 Cong.Rec. 39,721–22 (1973).

**18.** Before it was amended, the Anti-Deficiency Act authorized the President to "apportion[ ]" funds where justified by "other developments subsequent to the date on which such appropriation was made available." 31 U.S.C. § 665(c)(2) (1970). This open-ended language was amended to limit apportionments to three specified situations: "to provide for contingencies," "to achieve savings made possible by or through changes in requirements or greater efficiency of operations" or "as specifically provided by law." 31 U.S.C. § 1512(c)(1) (1982). The purpose of the amendment was to preclude the President from invoking the Act as authority for implementing "policy" impoundments, while preserving the President's authority to implement routine "programmatic" impoundments. *See, e.g.,* 120 Cong.Rec. 7658 (1974) (statement of Sen. Muskie). President Nixon had attempted to use the Act as an instrument for shaping fiscal policy. *See generally* Note, *Addressing the Resurgence of Presidential Budgetmaking Initiative: A Proposal to Reform the Impoundment Control Act of 1974,* 63 Tex.L.Rev. *693, 699–700 (1984).*

Sess. 43, *reprinted in* 1974 U.S. CODE CONG. & ADMIN.NEWS 3462, 3488. The Conference Committee Report also emphasizes that the bill was designed to provide Congress with an effective system of impoundment control. S.CONF.REP. No. 924, 93d Cong., 2d Sess. 49, 76–78, *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 3462, 3591, 3616–18.

When the numerous statements of individual legislators urging the passage of legislation to control presidential impoundments are also considered, the evidence is incontrovertible that the "basic purpose" of section 1013 was to provide each House of Congress with a veto power over deferrals. Yet, the appellants would have us hold that Congress, had it foreseen *Chadha,* would nevertheless have gone ahead and enacted section 1013 *without* a legislative veto provision. As difficult (and precarious) as it may be at times to reconstruct what a particular Congress might have done had it been apprised of a particular set of facts, we refuse to entertain this remarkable proposition. As the District Court aptly noted, the *"raison d'etre"* of the entire legislative effort was to assert *control* over presidential impoundments. 634 F.Supp. at 1454. It is simply untenable to suggest that a Congress precluded from achieving this goal would have turned around and ceded to the President the very power it was determined to curtail.

In this respect, this case is the complete converse of *Alaska Airlines, Inc. v. Donovan,* 766 F.2d 1550 (D.C.Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986), where we held that an unconstitutional legislative veto provision contained in section 43(f) of the Airline Deregulation Act of 1978, 49 U.S.C. § 1552(f) (1982), was severable from that portion of the statute authorizing the Secretary of Labor to issue regulations necessary to administer an employee protection program. Here, rather than adding the legislative veto provision as somewhat of an afterthought, as in *Alaska Airlines,* Congress focused almost exclusively on the means for asserting control over presidential impoundments.[19] The conclusion is thus inescapable that Congress would not have enacted section 1013 had it known that it could not exercise control over deferrals by means of a legislative veto.

The appellants argue vigorously that the opposite conclusion is compelled by the distinction drawn in the Act between rescissions and deferrals. As noted earlier, the original bill passed by the House would have permitted both rescissions and deferrals to go into effect automatically, subject of course to a legislative veto. *See* note 17 *supra.* The House Report explained that the Committee favored a legislative veto mechanism because

> [i]n the normal process of apportionment, the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year. If Congress adopts a procedure requiring it to approve every necessary impoundment, its legislative process would be disrupted by the flood of approvals that would be required for the normal and orderly operation of the government. The negative mechanism provided in H.R. 7130 will permit Congress to focus on critical and important matters, and save it from submersion in a sea of trivial ones.

H.R.REP. No. 658, 93d Cong., 1st Sess. 41, *reprinted in* 1974 U.S.CODE CONG. & ADMIN. NEWS 3462, 3486–87. In the final analysis, however, the House approach prevailed

---

19. It is true, as appellants assert, that the congressional debates also touched on the need for more effective notice to Congress of the President's intention to impound funds. *See, e.g.,* 120 CONG.REC. 20,481–82 (colloquy between Sen. Humphrey and Sen. Ervin). However, the District Court was correct in observing that the *central* issue debated at great length by Congress was "whether the President should be able to impound at all, or should be permitted to impound, but with various congressional circumscriptions of his power to do so." 634 F.Supp. at 1457–58. Our examination of the Act's legislative history also confirms the District Court's conclusion that Congress was not "very much concerned with, let alone determined to achieve, further detail about future Presidential impoundments *absent a mechanism for exercising control over them." Id.* (emphasis added).

only for deferrals; for rescissions, Congress adopted the Senate approach, which required prior congressional approval before a rescission could go into effect. According to the appellants, this distinction is critical, for it demonstrates that Congress' intent in enacting section 1013 was to render deferrals "presumptively valid." Brief of Defendants-Appellants at 31–33. Because Congress did not want to trouble itself by approving deferrals in advance, they argue, Congress would have authorized the President to implement deferrals even had it known that it could not maintain oversight over those deferrals by means of a legislative veto.

This argument completely misreads the above-quoted passage and is completely at odds with Congress' expressed intention to *control* rather than *authorize* presidential deferrals. First, the quoted passage plainly speaks to "trivial," everyday *programmatic* deferrals. It is these "trivial" impoundments relating to the "normal and orderly operation of the government" that Congress expected to present little controversy. Congress most certainly did not mean to suggest that impoundments designed to negate congressional budgetary *policies* would be "presumptively valid." It is precisely this sort of impoundment that Congress was determined to forestall.

Second, the quoted passage proves only that Congress preferred a system in which it need not enact legislation approving deferrals *because it could easily disapprove them* by the relatively simple expedient of the one-House veto. Nowhere in the legislative history is there the slightest suggestion that the President be given statutory authority to defer funds without the possible check of at least a one-House veto. Indeed, the House Report completely refutes the notion that Congress would have granted the President statutory authority to implement deferrals, thereby forcing itself to reenact an appropriations bill each time it disapproved of a deferral:

[The one-House veto] is suggested on the ground that the impoundment situation established by the bill involves a presumption *against* the President's refusing to carry out the terms of an already considered and enacted statute. To make Congress go through a procedure involving agreement between the two Houses on an already settled matter would be to require both, in effect, to reconfirm what they have already decided.

H.R.REP. No. 658, 93d Cong., 1st Sess. 42, *reprinted in* 1974 U.S.CODE CONG. & ADMIN. NEWS 3462, 3487 (emphasis added). Yet, a finding of severability would create a presumption in favor of deferrals and require Congress to legislate a second time in order to effectuate its budgetary policies. We cannot conceive of a result more contrary to congressional intent.

The appellants further argue that Congress' more permissive treatment of deferrals suggests that the congressional furor over "impoundments" was principally a dissatisfaction with rescissions. Brief of Defendants-Appellants at 37–39. Again, this contention has absolutely no basis in the legislative history. Although Congress certainly distinguished between rescissions and deferrals, it spoke in general terms of the need to control "impoundments," which it defined as "withholding or *delaying* the expenditure or obligation of budget authority ... and the termination of authorized projects or activities for which appropriations have been made." H.R.REP. No. 658, 93d Cong., 1st Sess. 52, *reprinted in* U.S. CODE CONG. & ADMIN.NEWS 3462, 3497 (emphasis added).[20] The appellants can point to nothing in the legislative history to suggest that members of Congress were disturbed with rescissions but tolerant of deferrals. Indeed, to the extent that Congress expressed any tolerance of deferrals at all, it was referring to routine programmatic deferrals, not policy deferrals. *Id.* at 42, 1974 U.S.CODE CONG. & ADMIN.NEWS at 3488 ("[T]he Committee recognizes that a brief delay in expending or obligating funds may sometimes be legitimately nec-

---

20. *Cf.* 120 CONG.REC. 19,674 (1974) (statement of Rep. Bolling) (analysis has shown that deferrals constitute the "lion's share" of impoundment actions).

essary for purely administrative reasons.").[21]

We cannot emphasize enough in this context the critical distinction between programmatic and policy deferrals. As the appellants concede, *see* Brief of Defendants-Appellants at 33, our holding in this case will not impair the President's ability to implement routine programmatic deferrals. When Congress amended the Anti-Deficiency Act in the ICA, it did not disturb the President's authority to "impound" funds for purely administrative purposes. *See* note 18 *supra.* Thus, the President may still invoke the Anti-Deficiency Act as authority for implementing programmatic deferrals. By amending the Anti-Deficiency Act, however, Congress intended to foreclose the President from relying on that Act as separate statutory authority for *policy* deferrals. Congress intended to permit policy deferrals only under section 1013, and only if it could ensure itself a ready means of overturning policy deferrals with which it disagreed. Had Congress known it could not employ such a mechanism, it most assuredly would not have nullified its own amendment to the Anti-Deficiency Act by creating new statutory authority for policy deferrals.

Finally, the appellants contend that if we invalidate section 1013 in its entirety, we must also strike down the ICA's other "deferral-related provision"—*i.e.,* Congress' amendment to the Anti-Deficiency Act. Brief of Defendants-Appellants at 57. We find this argument to be wholly specious. As noted earlier, a court's duty in a severability case is to preserve as much of the statute as it can consistent with congressional intent. We are unable to preserve section 1013 absent its legislative veto provision because to do so would produce a result wholly contrary to that intended by Congress. The amendment to the Anti-Deficiency Act, in contrast, is fully consistent with the expressed intent of Congress to control presidential impoundments. Thus, there is absolutely no basis for overturning Congress' amendment to the Anti-Deficiency Act.

### III. CONCLUSION

Section 1013 was designed specifically to provide Congress with a means for controlling presidential deferrals. As a consequence of the Supreme Court's decision in *Chadha,* however, that section has been transformed into a license to impound funds for policy reasons. This result is completely contrary to the will of Congress, which in amending the Anti-Deficiency Act sought to *remove* any colorable statutory basis for unchecked policy deferrals. We cannot imagine that Congress would have acted in complete contravention of its intended purposes by enacting section 1013 without a legislative veto provision. Accordingly, we hold that the unconstitutional legislative veto provision contained in section 1013 is inseverable from the remainder of the section, and we affirm the judgment of the District Court invalidating section 1013 in its entirety.

*So ordered.*

---

**21.** *Cf. id.* (suggesting that Congress will employ legislative veto only when it perceives that the President is attempting to alter Congress' budgetary policies, not when the proposed deferrals "are for routine financial purposes and involve neither questions of policy nor attempts to negate the will of Congress").