Sen. Robert C. BYRD, et al., Plaintiffs,

v.

Franklin D. RAINES, et al., Defendants.

Civil No. 97–0001 (TPJ).

United States District Court,
District of Columbia.

April 10, 1997.

Charles Justin Cooper, Shaw, Pittman, Potts & Trowbridge, Washington, DC, Lloyd Norton Cutler, Louis Richard Cohen, Wilmer, Cutler & Pickering, Washington, DC, Alan Butler Morrison, Public Citizen Litigation Group, Washington, DC, Michael Davidson, Washington, DC, for Robert C. Byrd, Mark O. Hatfield, Carl Levin, Daniel Patrick Moynihan, David E. Skaggs, Henry A. Waxman.

David Jay Anderson, U.S. Dept. of Justice, Civil Division, Washington, DC, Neil H. Koslowe, U.S. Dept. of Justice, Washington, DC, Adam Issenberg, U.S. Dept. of Justice, Civil Division, Washington, DC, for Franklin D. Raines, Robert E. Rubin.

Thomas B. Griffith, U.S. Senate, Office of Senate Legal Counsel, Washington, DC, for U.S. Senate.

Geraldine R. Gennet, U.S. House of Representatives, Washington, DC, for The Bipartisan Legal Advisory Group of the U.S. House of Representatives.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This action challenges the validity of legislation entitled the Line Item Veto Act, Pub. Law No. 104–130, 110 Stat. 1200 (1996) (to be codified at 2 U.S.C. §§ 681 note, 691 *et seq.*) ("the Act"), which empowers the President unilaterally to "cancel" certain appropriations and tax benefits after signing them into law. The Act represents an effort by Congress to enlist presidential assistance in controlling rampant federal spending by conferring upon the President what it termed a species of "enhanced rescission" power, expanding the authority he formerly possessed under the Impoundment Control Act of 1974. Plaintiffs, four Senators and two Congressmen,[1] contend that the *mechanism* chosen by Congress to its desired end contravenes the text and purpose of Article I, section 7, clause 2, known as the "Presentment Clause" of the Constitution. Rather than making expenditures of federal funds appropriated by Congress matters of presidential discretion, the Act effectively permits the President to repeal duly enacted provisions of federal law. This he cannot do. Accordingly, the Court will grant plaintiffs' motion for summary judgment, deny defendants' motion, and declare the Act unconstitutional.

### I.

*Operation of the Line Item Veto Act*

Following years of importuning by successive Presidents and vacillation by earlier Congresses, President Clinton approved the Line Item Veto Act as passed by the 104th Congress on April 9, 1996. Immediately after it became effective on January 1, 1997, the plaintiff Senators and Congressmen filed this action to declare it void. Named defendants are the Director of the Office of Management and Budget and the Secretary of the Treasury—the officials alleged, respectively, to be responsible for executing the President's "cancellations" of spending items and limited tax benefits under the Act. The United States Senate and the Bipartisan Legal Advisory Group of the United States House of Representatives have appeared jointly as *amici curiae* to defend the constitutionality of the Act.

The Act, which sunsets on January 1, 2005, allows the President, after signing a bill into law, to "cancel in whole"—

(1) any dollar amount of discretionary budget authority;

(2) any item of new direct spending; or

(3) any limited tax benefit.

---

1. Senators Robert C. Byrd, Daniel Patrick Moynihan, Carl Levin, and Mark O. Hatfield, and Representatives David E. Skaggs and Henry A. Waxman. All but Senator Hatfield are currently sitting Members of the 105th Congress.

2 U.S.C. § 691(a). "Dollar amounts of discretionary budget authority" include any dollar amount set forth in an appropriation law, including those to be found separately in tables, charts, or explanatory text of statements or committee reports accompanying legislation. 2 U.S.C. § 691e(7). Thus the President's cancellation power applies to legislative history as well as to statutory text itself. "Items of new direct spending" generally include "entitlement" payments to individuals or to state and local governments. 2 U.S.C. § 691e(8); H.R. Conf. Rep. No. 491, 104th Cong., 2d Sess. at 36 (1996). "Limited tax benefits" are those revenue-losing provisions that apply to 100 or fewer beneficiaries in any fiscal year, or tax provisions that provide temporary or permanent transitional relief for 10 or fewer beneficiaries from a change in the Internal Revenue Code. 2 U.S.C. § 691e(9). The Act directs the congressional Joint Committee on Taxation to identify limited tax benefits contained in bills and joint resolutions, and provides that those bills and resolutions may include a separate section in which identified tax benefits are not subject to cancellation. 2 U.S.C. § 691f(a)-(c).

The most critical definition is found in § 691e(4). The term "cancel" or "cancellation" means "to rescind" any dollar amount of discretionary budget authority or to prevent items of new direct spending or limited tax benefits "from having legal force or effect." *Id.*

To exercise the cancellation power the President must first determine that it will—

(i) reduce the Federal budget deficit;

(ii) not impair any essential Government functions; and

(iii) not harm the national interest.

2 U.S.C. § 691(a)(A). The President effects a cancellation by transmitting a "special mes-

sage" to Congress within five calendar days (excluding Sundays) after enactment of the law containing the item(s) in question. 2 U.S.C. § 691(a)(B). The Act spells out the content requirements for a special message and provides that it shall be printed in the Federal Register. 2 U.S.C. § 691a.

Once an item has been canceled, no further action by Congress is required; cancellation takes effect upon Congress' receipt of the special message. 2 U.S.C. § 691b(a). Congress may thereafter introduce a "disapproval bill" to reenact any canceled items within five days of receiving the special message, and must pass it within 30 days.[2] 2 U.S.C. § 691d(b), (c)(1). The President can, of course, exercise a conventional veto of any disapproval bill, but Congress can then reinstate the *status quo ante* by overriding that veto.

### Historical Background

The Act is best understood against the historical backdrop of the efforts of the President and Congress over the years to control government spending and, in more recent times, to reduce an ever-increasing federal budget deficit. It is a product of many years of inter-branch conflict and compromise over how to accomplish those goals. Since the outset of the 19th Century, American Presidents have labored to influence Congress' spending habits, and many have lobbied in particular for the authority to veto selected provisions of bills presented for their signature. *See* 12 Op. Off. Legal Counsel 128, 157–65 (1988). Congress has considered both amending the Constitution and enacting several alternative legislative measures to give the President the increased authority he has sought and Congress has intermittently resisted.

Although Presidents have uniformly acknowledged that the Constitution affords no inherent authority for a line-item veto[3]—

2. The President has no authority to cancel items contained in an enacted disapproval bill; he must take it or leave it as presented to him.

3. *See, e.g.,* 33 *Writings of George Washington* 96 (1940) ("From the nature of the Constitution, I must approve all the parts of a Bill, or reject it in toto."); William Howard Taft, *The Presidency: Its Duties, Its Powers, Its Opportunities and Its Limitations* 11 (1916) ("[The President] has no

power to veto parts of the bill and allow the rest to become a law. He must accept it or reject it ...."); 12 Op. Off. Legal Counsel 128, 157–65 (1988) (reviewing other Presidents' views and experience).

Although some commentators have argued that the Constitution does provide inherent authority for a line item veto, see Stephen Glazier, *Reagan Already Has Line-Item Veto*, Wall St. J., Dec. 4,

indeed, as explained below, it clearly forbids anything but rejection of a bill *in toto*—they have managed to exert their will by "impounding"—or simply not spending—appropriated funds. In some instances, Presidents have refused to spend money on measures that conflicted with their foreign policy objectives, or that would advance an unconstitutional purpose. Most of the time, however, Presidents simply preferred not to spend the money for the purposes for which Congress had allocated it. *See, e.g.,* David A. Martin, *Protecting the Fisc: Executive Impoundment and Congressional Power,* 82 Yale L.J. 1636, 1644–45 (1973). Some impoundments have been challenged successfully in federal court; others have either been judicially sanctioned or not contested at all. *See City of New Haven v. United States,* 634 F.Supp. 1449, 1454 (D.D.C.1986), *aff'd* 809 F.2d 900 (D.C.Cir.1987).

Although presidential impoundments throughout the 19th century occurred in a state of uncertainty as to their legality, Congress has in this century conferred a measure of legitimacy upon them and given some direction as to their use. In the Anti–Deficiency Acts of 1905 and 1906, requiring "apportionment" aimed at saving money for the end of a fiscal year, Congress also allowed the President to waive spending appropriations in the event of emergencies or unusual circumstances. Act of March 3, 1905, ch. 1484, § 4, 33 Stat. 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 48. When Congress amended the Anti–Deficiency Act in 1950, it created a mechanism for the Executive Branch to recommend the rescission of any reserves not required to carry out the purposes underlying an appropriation. General Appropriation Act of 1951, ch. 896, § 1211(c)(2), 64 Stat. 595 (current version at 31 U.S.C. § 1512(c)(1)).

Congress has not, however, always been sanguine about Presidents' refusal to spend appropriated funds. During the Nixon administration, for example, the President's extensive resort to impoundment prompted many lawsuits. *See City of New Haven,* 634 F.Supp. at 1454 ("by 1974, impoundments had been vitiated in more than 50 cases and upheld in only four"). President Nixon's reluctance to spend appropriated funds also provoked passage of the Impoundment Control Act of 1974 (the "ICA"), Pub.L. No. 93–344, 88 Stat. 332, a statute critical to an understanding of the present Act.

The ICA recognized two types of impoundment: "deferral" and "rescission." Deferral affects the timing of expenditures, and is accomplished by "withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities," or any other type of Executive action or inaction accomplishing the same result. 2 U.S.C. § 682(1). Deferral is permitted for contingencies, to effect savings achieved through changes or efficiency, or as specifically provided by law. 2 U.S.C. § 684(b). Under the ICA, the President effects a deferral, just as he cancels an item under the Line Item Veto Act, by transmitting to Congress a special message containing statutorily required information. 2 U.S.C. § 684(a). Also like cancellations under the Act, deferrals become effective upon Congress' receipt of the special message; unlike cancellations, however, they expire with the end of the fiscal year.[4] *Id.*

1987, at A14, col. 4; L. Gordon Crovitz, *The Line-Item Veto: The Best Response When Congress Passes One Spending "Bill" A Year,* 18 Pepp. L. Rev. 43 (1990), most scholars have concluded that the text of Article I, Sec. 7, unequivocally precludes such authority. *See, e.g.,* Bruce Fein & William Bradford Reynolds, *Wishful Thinking on a Line–Item Veto,* Legal Times, Nov. 13, 1989, at 30; Lawrence Tribe and Philip Kurland, Letter to Sen. Edward Kennedy, 135 Cong. Rec. S.14,387 (daily ed. Oct. 31, 1989); 12 Op. Off. Legal Counsel 128 (1988); 9 Op. Off. Legal Counsel 28 (1985). Moreover, at least two courts have stated in dicta that the President possesses no inherent item veto. *See Lear Sie-*

*gler, Inc. v. Lehman,* 842 F.2d 1102, 1124 (9th Cir. ), *reh'g en banc ordered,* 863 F.2d 693 (9th Cir. 1988), *withdrawn on other grounds,* 893 F.2d 205 (9th Cir. 1989) (en banc); *Thirteenth Guam Legislature v. Bordallo,* 430 F. Supp. 405, 410 (D.C.Guam 1977), *aff'd* 588 F.2d 265 (9th Cir. 1978).

4. Originally, deferrals were automatically effective but subject to a one-House legislative veto. 88 Stat. at 335. In light of *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the legislative veto component of the ICA was invalidated, *City of New Haven v. United States,* 809 F.2d 900 (D.C. Cir. 1987), and Congress

A rescission, under the ICA, is the cancellation of budget authority. 2 U.S.C. § 682(3). In contrast to a cancellation under the Line Item Veto Act, the ICA requires the President to *propose* a rescission by transmitting a special message to Congress, which Congress may enact or not, as it chooses, within 45 days. 2 U.S.C. § 683(b). The perceived deficiency of the rescission process under the ICA that inspired passage of the Line Item Veto Act was the necessity of congressional acquiescence. Whenever Congress neglected or declined to pass a bill enacting into law a proposed rescission—a most frequent occurrence—the rescission expired.

The cancellation procedure embodied in the Line Item Veto Act thus came to be known as "enhanced rescission," the enhancement consisting of elimination of the need for congressional action. Two principal alternatives to the Act considered and rejected by the 104th Congress were "expedited rescission" and "separate enrollment." The first, exemplified by S.14 in the 104th Congress, would have preserved the recommendation process but guaranteed that Congress actually and promptly vote on the President's rescission proposals. S. Rep. No. 9, 104th Cong., 1st Sess., at 15 (1995). The second would have treated each item of spending as a separate "bill" for the President to sign or veto. Separate handling of hundreds of items appeared to present insuperable practical obstacles, however, and potential constitutional difficulties as well. *See* 141 Cong. Rec. S.4217, S.4224–35, S.4244 (daily ed. Mar. 21, 1995). Both Houses of Congress also considered and rejected proposed constitutional amendments to impart line item veto authority. S.J. Res. 2, 14, 15, and 16, and H.J. Res. 4, 6, and 17, 104th Cong. (1995).

## II.

Before addressing the merits of the case, the Court is obliged to confront defendants' objections as to its justiciability. In a motion to dismiss the complaint defendants contend that plaintiffs lack standing to press their claim. They also assert that the case is not ripe for judicial resolution, and that the "equitable discretion" doctrine requires dismissal. None of these assertions is correct under the law of this Circuit.

*Standing* [5]

Defendants argue that plaintiffs fail to present a live case or controversy, first, because separation-of-powers considerations counsel against judicial intrusions into disputes between officials of the political branches and, second, because at this point no presidential cancellation has yet been attempted or threatened, and there has, thus, been no discernible injury.

The parties agree on the standard to be applied: plaintiffs must allege, as "an irreducible minimum," (1) an injury personal to them, (2) that has actually been inflicted by defendants or is certainly impending, and (3) that is redressable by judicial decree. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

Defendants acknowledge that, pursuant to this well-settled standard, this Circuit has repeatedly recognized Members' standing to challenge measures that affect their constitutionally prescribed lawmaking powers. *See, e.g., Michel v. Anderson*, 14 F.3d 623, 625 (D.C.Cir.1994) (Members had standing to challenge House Rule permitting delegates to vote in Committee of the Whole based on its alleged vote-diluting effect); *Moore v. U.S. House of Representatives*, 733 F.2d 946, 950–53 (D.C.Cir.1984) (standing to assert violation of constitutional requirement that revenue-raising bills originate in the House), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1168–71 (D.C.Cir.) (standing to challenge leadership's committee-seating assignments), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).

---

subsequently amended the ICA to eliminate the offending procedure.

**5.** Only Article III standing, as opposed to prudential limitations, is at issue in light of Congress' creation of an express right of action in § 692(a)(1) of the Act.

In each case the D.C. Circuit found no separation-of-powers impediments to adjudication of the merits because, as in the present case, Members' alleged injuries arose from interference with the exercise of identifiable constitutional powers. *See Moore,* 733 F.2d at 951. Although the Supreme Court has never endorsed the Circuit's analysis of standing in such cases, for this Court's purposes these precedents are controlling.[6]

■ Plaintiffs' claim of injury in this case, namely, that the Act dilutes their Article I voting power, is likewise of the kind that suffices to confer standing under Article III. Previously, when a Member voted for an appropriations bill containing multiple items, he or she could be certain that any variation of the package once passed would require another vote by both chambers of Congress. Under the Act, however, as plaintiffs describe it, the Members same vote operates only to present the President with a "menu" of items from which he can select those worthy of his approval, not a legislative *fait accompli* that he must accept or reject in whole, as in the past. As one Senator characterizes it, his vote for an "A–B–C" bill might lead to the *post hoc* creation of an "A–B" law, an "A–C" law, or a "B–C" law, depending on the President's use of his newly conferred cancellation authority, for which neither he nor his colleagues would have voted so reconfigured. Thus, plaintiffs' votes mean something different from what they meant before, for good or ill, and plaintiffs who perceive it as the latter are thus "injured" in a constitutional sense whenever an appropriations bill comes up for a vote, whatever the President ultimately does with it.

Circuit precedent has recognized only interference with the "constitutionally mandated process of enacting law" as sufficient to confer standing upon Members to maintain legal action for redress. *Moore,* 733 F.2d at 951. According to plaintiffs, their right to formulate an appropriations bill that meets with the approval of a majority of both Houses alone, ignoring presidential preferences, is mandated by the Presentment Clause itself. Under the Act the dynamic of lawmaking is fundamentally altered. Compromises and trade-offs by individual lawmakers must take into account the President's item-by-item cancellation power looming over the end product. The Court concludes that plaintiffs have standing because they allege that the Act "interferes with their 'constitutional duties to enact laws regarding federal spending' and infringes upon their lawmaking powers under Article I, Section 7." *Synar v. United States,* 626 F.Supp. 1374, 1382 (D.D.C.1986), *aff'd sub nom. Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

*Ripeness*

■ Defendants' primary justiciability contention is that plaintiffs must wait until the President cancels an item to bring this lawsuit. Their facial challenge to the Act would elicit an advisory opinion, defendants argue, because whether the President will exercise his authority at all (and whether various other consequences will follow) is entirely speculative. Indeed, courts may not exercise jurisdiction consistent with Article III where a dispute is so unformed as to fail the "case or controversy" requirement. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974). And in constitutional cases, courts must be particularly careful not to render decisions that are unnecessary. *See United States v. National Treasury Employees Union,* 513 U.S. 454, ——, 115 S.Ct. 1003, 1019, 130 L.Ed.2d 964 (1995). The injury that gives shape to a dispute need not have occurred, however, so long as it is "certainly impend-

---

**6.** Defendants rely on two concurring opinions by D.C. Circuit Judges in arguing that plaintiffs' injury is not sufficiently personal to create a justiciable controversy. *See Moore,* 733 F.2d at 957–61 (Scalia, J., concurring); *Vander Jagt,* 699 F.2d at 1179–82 (Bork, J., concurring). Yet, as the three-judge court, of which then-Judge Scalia was a member, recognized in *Synar v. United* *States,* 626 F. Supp. 1374, 1382 (D.D.C. 1986), *aff'd sub nom. Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), this Circuit's cases unequivocally establish that Members have "a personal interest ... in the exercise of their governmental powers." 626 F. Supp. at 1381 & n.7.

ing." *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 1725, 109 L.Ed.2d 135 (1990).

In focusing solely on the President's actual exercise of his cancellation power, defendants overlook plaintiffs' allegation of ongoing harm that befalls them irrespective of whether the President ever cancels an item.[7] The Supreme Court considered an analogous claim ripe in *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991), where a Board of Review composed of Members of Congress possessed an as-yet unexercised power to veto decisions of MWAA's Board of Directors. "The threat of the veto hangs over the Board of Directors like the sword over Damocles, creating a 'here-and-now subservience' to the Board of Review sufficient to raise constitutional questions," the Court held. *Id.* at 265 n. 13, 111 S.Ct. at 2306 n. 13. *See also Bowsher v. Synar,* 478 U.S. 714, 727 n. 5, 106 S.Ct. 3181, 3188 n. 5, 92 L.Ed.2d 583 (1986). Because plaintiffs now find themselves in a position of unanticipated and unwelcome subservience to the President before and after they vote on appropriations bills, Article III is satisfied, and this Court may accede to Congress' directive to address the constitutional cloud over the Act as swiftly as possible.[8]

Plaintiffs' declarations make clear that the budgetary process is already underway. The President presented his budget proposal in early February, and Members will consider and vote on appropriations between now and October 1, 1997, when the new fiscal year begins. Moreover, Congress is likely to vote on supplemental appropriations for this fiscal year in the next few months. To be sure, appropriations votes are inevitable, and "certainly impending." *Whitmore,* 495 U.S. at 158, 110 S.Ct. at 1725.

■ Defendants' argument that the case is not ripe because further factual development is required is also unpersuasive. The issues in this case are legal, and thus will not be clarified by further factual development. In what context and when the President cancels an appropriation item is immaterial. The Court will be no better equipped to weigh the constitutionality of the Presidents cancellation of an item of spending or a limited tax benefit after the fact; the central issue is plain to see right now.[9]

■ Finally, defendants assert that plaintiffs' claim is not ripe because the Act might be repealed, or suspended with respect to particular appropriations; a disapproval bill might subsequently vindicate a Members vote as he intended it; or, if not, Congress could override a presidential veto of a disapproval bill. There are two answers to this argument. First, it ignores the "sword of Damocles" effect that pervades the process irrespective of whether the President ever cancels an item. Second, just because Congress *as a whole* can suspend or repeal the Act, or pass a disapproval bill, does not mean that an *individual* Member's injury is illuso-

---

7. Even if an actual cancellation by the President were required to cause injury, Article III arguably would not require plaintiffs to wait for that event to invoke the Court's jurisdiction. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967); *Buckley v. Valeo,* 424 U.S. 1, 117, 96 S.Ct. 612, 681, 46 L.Ed.2d 659 (1976) (challenge was ripe in anticipation of "impending future rulings and determinations").

   The President has expressed his intention to invoke his new powers under the Act *this year. See* 141 Cong.Rec. S.8202-03 (daily ed. June 13, 1995) (containing letter from President to Speaker of the House).

8. As in the case of standing, plaintiffs need only satisfy the Article III component of ripeness because Congress unmistakably declared the case

fit for judicial review in § 692(c) of the Act. Accordingly, this Circuit's conclusion in *National Treasury Employees Union v. United States,* 101 F.3d 1423, 1431 (D.C. Cir. 1996) (*"NTEU"*), that prudential (as well as constitutional) considerations made the union's challenge to the Act not ripe is inapposite.

9. Moreover, fitness for review is a prudential component of the ripeness doctrine, an inquiry Congress obviated by calling for expedited judicial action. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-81, 105 S.Ct. 3325, 3332-33, 87 L.Ed.2d 409 (1985); *NTEU,* 101 F.3d at 1431. But even if the Court were to take into account prudential ripeness factors, they actually militate in plaintiffs' favor, because resolving the issue now will avert the cloud that would hang over any canceled item that Congress fails to disapprove.

ry. A Member cannot procure any such relief on his own. Indeed, the possibility of relief from Congress as a whole is just the sort of speculative prospect that the Court would reject if it were instead offered in *support* of standing. Just as the *NTEU* plaintiffs did not have standing simply because the Act made certain injuries possible, 101 F.3d at 1429–30, the present plaintiffs' standing is not undermined by virtue of the fact that the Act makes certain remedies conceivable.

*Equitable Discretion*

██ Defendants urge the Court to exercise its equitable discretion to dismiss the complaint because of separation-of-powers concerns, which apply not only in cases involving internal rules of Congress, *see Skaggs v. Carle,* 898 F.Supp. 1, 2 (D.D.C.), appeal docketed, No. 95–5323 (D.C.Cir. Sept. 25, 1995), but also in cases involving challenges to the validity of the legislation itself, *see Riegle v. Federal Open Market Comm.,* 656 F.2d 873, 881 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981).

In this case, however, the Court's equitable power to abstain from taking jurisdiction has been foreclosed by Congress' own determination to invite a lawsuit. *See* 2 U.S.C. § 692(a)(1). There is therefore neither reason nor occasion to exercise discretion by avoiding the case. *See Synar,* 626 F.Supp. at 1382 ("Section 274 specifically provides for [declaratory] relief to [Members of Congress], thus eliminating whatever equitable discretion might exist and leaving only the limitations of Article III.").

### III.

██ The Court now turns to the issue presented, namely, whether the Act's conferral of cancellation power upon the President violates the Presentment Clause. The Act enjoys a presumption of validity, and the Court may not undertake to evaluate its wisdom. *See INS v. Chadha,* 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983). Even if the Act were to appear salutary—or even exigent, given the intractable (and interminable) budget controversy—that fact cannot affect the Courts inquiry. *Id.* Though a court does not lightly resolve to invalidate a law of the United States, it must nevertheless vindicate the Constitution and the governmental framework it envisions. "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar,* 478 U.S. 714, 730, 106 S.Ct. 3181, 3190, 92 L.Ed.2d 583 (1986). Accordingly, the Supreme Court has "not hesitated to invalidate provisions of law which violate [the separation of powers]," *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 273, 111 S.Ct. 2298, 2310, 115 L.Ed.2d 236 (1991), and this Court can do no less.

This case is indisputably one of first impression. The issue it poses will undoubtedly be finally resolved by the Supreme Court, but at present such Supreme Court precedent as can be found only intimates what the result will be. It is by that jurisprudence, however, that this Court must be guided, and the lesson of those cases appears to be that not even the most beguiling of upgrades to the machinery of national government will be countenanced unless it comports with the constitutional design.

██ Shorn of its political and policy-laden implications, this case turns on the narrow and subtle question of whether the President's power under the Act is simply a present-day enlargement of his historically sanctioned impoundment power as it has existed from time to time, as defendants urge, or rather a radical transfer of the legislative power to repeal statutory law, as plaintiffs believe. As explained below, the Court agrees with plaintiffs that, even if Congress may sometimes delegate authority to impound funds, it may not confer the power permanently to rescind an appropriation or tax benefit that has become the law of the United States. That power is possessed by Congress alone, and, according to the Framers' careful design, may not be delegated at all.

*The Presentment Clause*

██ The Presentment Clause requires that any bill making or changing federal law

must be first passed by both Houses of Congress and then presented to the President *in toto*, in which form he acts upon it, either to make it (or allow it to become) a law, or to return it to Congress for reconsideration.[10] U.S. Const. art. I, § 7, cl. 2. Plaintiffs focus on the language of "approval;" the President's primary duty under the Presentment Clause, they say, is one of approval or disapproval. If he approves of the bill, *in toto*, his signature is but a ministerial formality. If he does not approve of it, *in toto*, his duty obliges him to return it with his "objections" to the House in which it originated, or at least to leave it be. If he signs it while disapproving of it—or parts of it—as the Act purports to authorize him to do, then he does so, according to plaintiffs, in violation of the Presentment Clause.

For defendants, the operative words are, "he shall sign it." It is the bright-line act of signing alone that converts a bill into law. Approval is a highly subjective, and a temporal, concept. A President may "approve" of a bill for many reasons, not all of which import enthusiasm for its legislative consequences. A President may sign a bill of which he actually disapproves (as undoubtedly many Presidents have done) for political, diplomatic, or other purposes unrelated to his judgment of its merit.

■ The Court agrees with defendants that the act of signing a bill is the critical requirement of the Presentment Clause.

The President's judgment of approval coincides with his decision to sign a bill; it has no independent operative significance. Whether a bill is or is not a law of the United States cannot depend on the President's state of mind when he affixes his signature. He may object to various appropriations and limited tax benefits—that is, he may *disapprove* of them—but nevertheless sign a bill and thereby remain in full compliance with the Presentment Clause. Likewise, no subsequent action by the President is capable of retroactively undermining the approval he registered with his signature. By that time the Article I approval process has run its course, and the bill indisputably has become a law of the United States. *See United States v. Will*, 449 U.S. 200, 224–25 & n. 29, 101 S.Ct. 471, 485 & n. 29, 66 L.Ed.2d 392 (1980); *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 454, 35 Ct.Cl. 623, 20 S.Ct. 168, 178, 44 L.Ed. 223 (1899); *Burgess v. Salmon*, 97 U.S. 381, 384–85, 24 L.Ed. 1104 (1878).

■ Yet, although the Court agrees that statutes subject to cancellation will have been "approved" in accordance with the Presentment Clause, the Act is vulnerable to the additional charge that, following approval, a cancellation by the President is a legislative repeal that itself must comply with Presentment Clause procedures. The Court must resolve this issue in light of the Supreme Court's admonishment that "[t]he legislative

---

**10.** In the Framers' words:

> Every Bill which shall have passed the House of Representatives and the Senate shall, before it become a Law, be presented to the President of the United States; If he approve it he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have

been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its return, in which Case it shall not become a Law.

U.S. Const. art. I, § 7, cl. 2.

At the behest of James Madison, the Framers included the following clause to ensure that Congress could not evade the presentment requirement simply by passing legislation in forms other than bills:

> Every Order, Resolution, or Vote to Which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives according to the Rules and Limitations prescribed in the Case of a Bill.

U.S. Const. art. I, § 7, cl. 3.

steps outlined in Art. I are not empty formalities; they were designed to assure that both Houses of Congress and the President participate in the exercise of lawmaking authority." *Chadha,* 462 U.S. at 958 n. 22, 103 S.Ct. at 2787 n. 22. It is insufficient, therefore, for defendants to argue that, notwithstanding the resemblance between a cancellation and a statutory repeal, the Act should stand because the same result could be accomplished through clearly constitutional means. Rather, "the purposes underlying the Presentment Clauses ... must guide resolution of the question whether a given procedure is constitutional." *Id.* at 946, 103 S.Ct. at 2781.

Fundamentally, the Presentment Clause enforces "bicameralism" and circumscribes the President's ability to act unilaterally. *See Field v. Clark,* 143 U.S. 649, 692–93, 12 S.Ct. 495, 504–05, 36 L.Ed. 294 (1892). It embodies "the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Chadha,* 462 U.S. at 951, 103 S.Ct. at 2784. The President's contribution to the process is his approval of (or objection to) legislation as Congress presents it to him. His is merely a qualified check on the will of the legislature. *See* 1 *The Records of the Federal Convention of 1787* at 97–105 (Max Farrand ed., 1987). The President must consider the whole of the bill presented, which, in today's world of omnibus appropriations and myriad riders, is an undeniably difficult task. Nevertheless, upon considering a bill, he must reach a final judgment: either "approve it," or "not." U.S. Const. art. I, § 7, cl. 2. Once he has by his signature transformed the whole bill into a law of the United States, the President's sole duty is to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. *See also Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

Where the President signs a bill but then purports to cancel parts of it, he exceeds his constitutional authority and prevents both Houses of Congress from participating in the exercise of lawmaking authority. The President's cancellation of an item unilaterally effects a repeal of statutory law such that the bill he signed is not the law that will govern the Nation. That is precisely what the Presentment Clause was designed to prevent.

*Delegation of Spending Authority vs. Exercise of Lawmaking Power*

Defendants dismiss the notion that the Act represents an abdication of Congress' Article I lawmaking power, arguing that it merely ratifies traditional impoundment authority of the President in a novel form. Defendants and *amici* both allude to a long history of presidential impoundments, many of which have been tested by courts, and as to which the issue has been confined primarily to whether Congress intended to delegate discretion to the President not to spend money it had appropriated; that is, whether its appropriations were permissive or mandatory. *See, e.g., Train v. City of New York,* 420 U.S. 35, 41, 95 S.Ct. 839, 843, 43 L.Ed.2d 1 (1975); *City of New Haven v. United States,* 634 F.Supp. 1449, 1454 n. 6 (D.D.C.1986) (citing cases), *aff'd* 809 F.2d 900 (D.C.Cir.1987). The effect of the ICA was to make all appropriations presumptively mandatory. The Line Item Veto Act merely reverses that presumption, at least for a period of five days. During that limited period, the President has the option to "cancel" any appropriation—he may not change it in any manner—after which it remains in the law as he signed it, to be faithfully executed with the remainder.[11] If he cancels it with an appropriate message to Congress, it is extinguished, as if it had never been part of the bill, unless Congress revives it with a new bill, passed like any other by both Houses of Congress and presented anew to the President. In the meantime no money can be spent for it, just as would have been the case had it been "deferred" or "rescinded" in accordance with the ICA. The Line Item Veto Act is, therefore, according to defendants, merely an advance delegation by Congress to the President of a brief period of discretion to spend

---

11. Defendants cite no analog, as a species of impoundment or anything else, however, to the power to "cancel" limited tax benefits found in the Act.

or not, as his judgment dictates, subject to the broad injunctions that his decision not to spend operate to reduce the deficit, and will not impair any essential Government functions or harm the national interest. It is, they say, "evolutionary, not revolutionary," Def. Motion for Summary Judgment at 3, in the perpetual contest of will between Congress and the President in matters of the federal budget.

█ It has long been held that Congress may—indeed, of necessity, must—delegate vast authority to the Executive Branch of government to make and to change rules for the governance of national affairs, so long as they are in furtherance of the will of Congress. When courts have inquired into whether Congress has abdicated its legislative function in cases of allegedly overbroad delegations, their sole concern is whether Congress itself articulated "intelligible principles" by which delegated authority is to be exercised. *See Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 654, 102 L.Ed.2d 714; *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 409, 48 S.Ct. 348, 351, 352, 72 L.Ed. 624 (1928). Since 1935, the Supreme Court has "upheld, without exception, delegations under standards phrased in sweeping terms." *Loving v. United States*, —— U.S. ——, ——, 116 S.Ct. 1737, 1750, 135 L.Ed.2d 36 (1996). Defendants are therefore correct that, if the Act's conferral of cancellation power, at least with respect to appropriations, can be equated with a delegation of impoundment authority, their burden under the delegation standard is not "a tough one." *National Fedn. Of Fed. Employees v. United States*, 905 F.2d 400, 404 (D.C.Cir.1990).[12]

█ But defendants are mistaken in asserting that Article I concerns disappear once the President has signed a bill into law, and, consequently, that the delegation doctrine is the only hurdle for them to surmount. Their analysis assumes that Congress conferred a delegable power. It did not; it ceded basic legislative authority. The Constitution vests "all legislative Powers" of the United States in Congress, U.S. Const. art I, § 1, including the power of repeal. *Chadha*, 462 U.S. at 954, 103 S.Ct. at 2785. As *Chadha* made clear, there are formal aspects of the legislative process that Congress may not alter. Just as Congress could not delegate to one of its chambers the power to veto select provisions of law, it may not assign that authority to the President. Before the question of a delegation's excessiveness ever arises, then, a court must be convinced that Congress did not attempt to alienate one of its basic functions.

█ In no case where the Supreme Court decided that a delegation of broad authority was saved by Congress' articulation of intelligible principles was the Court faced with an equivalent of the cancellation power given to the President by the Line Item, Veto Act. Cancellation under the Act is simply not the same thing as impoundment, or any other suspension of a statutory provision. Instead, cancellation is equivalent to repeal[13]—and "repeal of statutes, no less than enactment, must conform with Art. I." *Chadha*, 462 U.S. at 954, 103 S.Ct. at 2785. Cancellation forever renders a provision of federal law without legal force or effect, so the President who canceled an item and his successors must turn to Congress to reauthorize the foregone spending. Whereas delegated authority to impound is exercised from time to time, in light of changed circumstances or shifting executive (or legislative) priorities, cancellation occurs immediately and irreversibly in the wake of the operationalizing "approval"

---

**12.** *See, e.g., Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 219, 109 S.Ct. 1726, 1731, 104 L.Ed.2d 250 (1989) (upholding delegation of authority to establish and collect pipeline safety fees); *Lichter v. United States*, 334 U.S. 742, 778, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948) (upholding grant of power to recover excessive wartime profits); and *Yakus v. United States*, 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834

(1944) (upholding broad delegation of price-fixing authority).

**13.** As noted *supra*, pp. 16–17, § 691e(4) of the Act defines the verb "cancel" as meaning "to rescind." *Webster's Third New International Dictionary* 1924 (G.&C. Merriam Co. 1981) defines the verb "repeal" as meaning "1: to rescind or revoke (as a sentence or law) from operation or effect."

of the bill containing the very same measures being rescinded.

Thus the cancellation power conferred by the Act is indeed revolutionary, as plaintiffs assert. Never before has Congress attempted to give away the power to shape the content of a statute of the United States, as the Act purports to do. As expansive as its delegations of power may have been in the past, none has gone so far as to transfer the function of repealing a provision of statutory law. The power to "make" the laws of the nation is the exclusive, non-delegable power of Congress which the Line Item Veto Act purports to alienate in part for eight years. That it can be recaptured if Congress repeals the Act, or suspends it (either in general, or in particular circumstances) does not alter the fact that, until Congress does so by a separate bill which the President signs (or as to which his veto is overridden), the President has become a co-maker of the Nations laws. The duty of the President with respect to such laws is to "take care that [they] be faithfully executed." U.S. Const. art II, § 3. Canceling, i.e., repealing, parts of a law cannot be considered its faithful execution.[14]

Moreover, if cancellation power could constitutionally be delegated as to appropriations and limited tax benefits, defendants have yet to show a tenable constitutional distinction between appropriation and tax laws, on the one hand, and all other laws, on the other. In fact, defendants deny any obligation to suggest such a distinction at all. At oral argument they insisted that there is virtually no limit to the express Article I powers Congress may delegate if it chooses, so long as it articulates "intelligible princi-

ples" by which its delegee is to be guided. If that is so—if Congress can delegate to the President the power to reconfigure an appropriations or tax benefit bill—why can he not also cancel provisions of an environmental protection or civil rights law he disfavors, and upon exactly the same "principles" as are to guide his exercise of cancellation authority under the Line Item Veto Act?

As authority for the proposition that it is constitutionally permissible for Congress to delegate to the President the power to render a law of the United States inoperable, defendants cite the case of *Field v. Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892). Aside from the fact that the presidential action approved by the Supreme Court in *Field v. Clark* was merely the "suspension" of duly enacted tariffs, not their cancellation, the case is also distinguishable on the ground that the Supreme Court recognized the practice of "legislating in contingency;" that is, where Congress itself determines in advance when conditions yet to occur should cause the law to cease to be operative. The President is merely the instrument of its will. *Id.* at 683–92, 12 S.Ct. at 501–04. *See also United States v. Rock Royal Co-Op. Inc.*, 307 U.S. 533, 577–78, 59 S.Ct. 993, 1014–15, 83 L.Ed. 1446 (1939); *Currin v. Wallace*, 306 U.S. 1, 15–16, 59 S.Ct. 379, 386–87, 83 L.Ed. 441 (1939); *The Brig Aurora*, 11 U.S. (7 Cranch) 382, 388, 3 L.Ed. 378 (1813),[15] The Line Item Veto Act, in contrast, hands off to the President authority our fundamental legislative choices. Indeed, that is its reason for being. It spares Congress the burden of making those vexing choices of which programs to preserve and which to cut. Thus, by placing on itself the

---

**14.** Defendants suggest that, in canceling future appropriations, the President will, in fact, be faithfully executing the Line Item Veto Act to reduce the deficit. But the Act contains no mandate to the President to reduce the deficit. It merely conditions cancellations for whatever reason upon, *inter alia*, their having a deficit-reducing effect.

**15.** As the Supreme Court further explained in *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 407, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928), 30 years later:

Congress may feel itself unable conveniently to determine exactly when its exercise of the leg-

islative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be affected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the legislature on the expression of the voters of a certain district.

"onus" of overriding the President's cancellations, *see* H.R. Conf. Rep. No. 491, 104th Cong., 2d Sess. at 16 (1996), Congress has turned the constitutional division of responsibilities for legislating on its head.

The Court therefore agrees with plaintiffs. In those Supreme Court cases which this Court finds most instructive for its purposes, most notably *Chadha*, the Supreme Court has repeatedly counseled that when the Constitution speaks to the matter, the Constitution alone controls the way in which governmental powers shall be exercised.[16] The formalities of the constitutional framework must be respected; the several estates subject to it must function within the spheres the Constitution allots to them.

### IV.

In passing the Act, Congress and the President addressed the significant problem of runaway spending, striving to create a more efficient process. But "the Framers ranked other values higher than efficiency." *Chadha*, 462 U.S. at 959, 103 S.Ct. at 2788. As the Court elaborated:

> With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.

*Id.* Various legislative alternatives remain available to give the President a more significant role in restraining government spending. For example, the "expedited rescission" model favored by many Members of the 104th Congress would retain the President's role as a recommender of rescissions, *see* U.S. Const. art. II, § 3, and force Congress to vote on such proposals. And, of course, Congress remains free to attempt passage of a constitutional amendment if it determines that the President should have unilateral revisionary power.

For the foregoing reasons, it is, this 10th day of April, 1997,

ORDERED, that defendants motion to dismiss the complaint and motion for summary judgment are denied; and it is

FURTHER ORDERED, that plaintiffs motion for summary judgment is granted; and it is

FURTHER ORDERED, that the Line Item Veto Act, Pub. Law No. 104–130, 110 Stat. 1200 (1996), is adjudged and declared unconstitutional.

---

**16.** *See also Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise*, 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991); *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *cf. U.S. Term Limits v. Thornton*, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881(1995).